626 So.2d 374 (1993)
Florida Mae CARR and Regia S. Hargrove
v.
The CITY of NEW ORLEANS.
No. 92-CA-1917.
Court of Appeal of Louisiana, Fourth Circuit.
October 14, 1993.
Rehearings Denied December 9, 1993.
*375 Gregory P. DiLeo, Michael Bourquard, New Orleans, for plaintiffs/appellees.
Scott G. Jones, Roger D. Marlow, Hulse, Nelson & Wanek, New Orleans, for defendants/appellants Continental Cas. Co. and Valley Forge Ins. Co.
William D. Aaron, Jr., City Atty., Charles G. Smith, Asst. City Atty., Bruce G. Whittaker, Deputy City Atty., Brett J. Prendergast, Chief of Civ. Litigation, New Orleans, for defendant/appellant City of New Orleans.
Before CIACCIO, BYRNES, LOBRANO, WARD and LANDRIEU, JJ.
*376 LOBRANO, Judge.
Nolmar Corporation, its insurers, Continental Casualty Company and Valley Forge Insurance Company, (collectively referred to as Nolmar) and the City of New Orleans appeal the judgment of the trial court in favor of Florida Mae Carr and Regia S. Hargrove. Carr and Hargrove answered the appeal seeking a reapportionment of fault.
On September 13, 1988 Carr sustained serious personal injuries as a result of a slip and fall accident which occurred in the basement restroom of the Municipal Court Building. The building is owned by the City of New Orleans. Nolmar contracted with the City to provide janitorial services at that location. As a result of the injuries she sustained, Carr initially sued the City alleging negligence and strict liability. She later amended her petition adding Nolmar and its insurers as defendants. Carr's mentally incapacitated son, Regia Hargrove, sued for loss of consortium. Less than sixty days prior to trial Nolmar attempted to file a third party complaint against the New Orleans Sewerage and Water Board and Sheriff Charles Foti, but the court refused the request as untimely. Nolmar however, had previously filed a cross claim against the City.
The matter was tried against Nolmar by a jury, and against the City by the trial judge. The jury returned a verdict in favor of the plaintiffs finding Nolmar 90% responsible, a phantom tortfeasor (PT) 10% responsible and 0% fault on the City. The jury awarded Carr $684,300.00 in damages and Hargrove $20,000.00. The trial judge, in deciding the City's fault, concluded differently. He found Nolmar 33 1/3% at fault, the City 33 1/3%, and the unknown people and/or the Sewerage and Water Board, 33 1/3% at fault. He also found the jury's damage award inadequate, awarding Carr $790,939.57 and Hargrove $30,000.00.[1]
In an attempt to reconcile the jury's findings with its own, the Court rendered judgment in favor of Carr and Hargrove and against Nolmar, in the amounts of $615,870.00 and $18,000.00, respectively. The Court then granted judgment in favor of Nolmar and against the City in the amount of $410,469.78, citing Civil Code Article 2324.
Both Nolmar and the City perfect this appeal essentially arguing that the apportionment of fault is erroneous and the damages are excessive.[2] The plaintiffs answered the appeal asserting seven assignments. However all but two have been abandoned.[3] The initial issue raised by Nolmar and the City, however, concerns the standard of review by this Court. Both assert that in this bifurcated trial the jury verdict and the judge's finding are hopelessly inconsistent and therefore this Court is required to make its own independent factual findings based on the record.

STANDARD OF REVIEW:
The trial of this case was properly bifurcated since trial by jury against the State and its political subdivision is expressly prohibited. La.R.S. 13:5105. Where inconsistencies exist in the findings of the jury and the trial judge, this court has held that an independent review of the record must be made without according any weight to the conclusions of either the jury or the trial judge. McCullough v. Regional Transit Authority, 593 So.2d 731 (La.App. 4th Cir.1992), writ den. 595 So.2d 655 (1992).[4]
Plaintiffs argue that the trial judge reconciled the apparent inconsistencies in the factual conclusions by rendering a judgment in favor of Nolmar on its cross claim against *377 the City. Plaintiffs cite the reasoning in Lemire v. New Orleans Public Service, Inc., 458 So.2d 1308 (La.1984) in support of their argument. Nolmar argues, however, that both the fault and damage determinations are inconsistent, that there was no judgment notwithstanding the verdict or grant of a new trial as required by Lemire, to reconcile the differences, and that, the actual judgment rendered did not accomplish a reconciliation.
We analyze each finding on its own. Had a judgment been rendered based only on the jury verdict, the plaintiffs would have been awarded 90% of $704,300.00 (the jury award) or $633,870.00.[5] Had a judgment been rendered only on the judge's findings, the City would have been liable to plaintiff up to 50% of $820,939.57, the trial court's damage amount.[6]
Obviously, the plaintiff cannot recover more than 100% of her damages (either the jury's amount or the trial judge's amount). However, that would be the net effect of two separate judgments. In order to reconcile and harmonize the findings in a single judgment, the trial judge did not render judgment in favor of plaintiffs against the City. Instead, he rendered judgment in favor of Nolmar against the City on its cross claim. However, that award, $410,469.78, is fifty percent of the amount the trial judge determined as proper damages. Thus, the net result of this single judgment is that plaintiffs recover 90% of the jury award, $633,870.00, from Nolmar, Nolmar then collects $410,469.78 from the City, and the City pays nothing to the plaintiffs.
Initially, we note that there is an obvious and substantial difference in the damage award of the jury and judge. We also note that contribution amongst solidary obligors where the obligation arises from an offense or quasi offense is based on their respective proportions of fault. C.C. Art. 1804. Thus, it would seem the City should only be required to contribute to Nolmar the actual percentage of its fault, 33 1/3%. However, if Article 1804 is read in conjunction with Article 2324 perhaps it could be argued that since the City "may" be liable to plaintiffs for up to 50% of the damages, its contribution amount to Nolmar should also be 50%. We need not solve that issue, however, since under either contribution scenario (either 33 1/3% or 50%) the trial judge's calculations are based on his damage award, which is considerably more than the jury award.
Because of the differences in fault apportionment and the damages awarded, we must conclude that the findings of the jury and judge are hopelessly inconsistent. The trial judge's valiant attempt to reconcile them in a single judgment was unsuccessful. We recognize and appreciate the trial judge's comments concerning the apparent absurdity of bifurcated trials in factual scenarios such as presented in this case however we shall follow the standard recognized in McCullough, supra, and make our own findings based on an independent review of the record.[7]

FACTUAL CONCLUSIONS
The record establishes that on September 13, 1988, Florida Carr and her sister, Catherine Benjamin, went to the Municipal Court Building in New Orleans to try to get Carr's son, Regia Hargrove, out of jail after his arrest for disturbing the peace. They arrived at the courthouse at approximately 9:00 a.m. and sometime later that morning, Carr decided to go to the restroom. An unidentified female gave Carr directions to a bathroom in a part of the building referred to as the basement.
After Carr was gone for an unusually long time, her sister became concerned and decided to look for her. Benjamin found Carr on *378 the floor of the basement bathroom near a drain in the middle of the floor. Carr was not moving. Benjamin noticed that the floor near the drain was wet and covered with feces, urine and toilet tissue. Because Carr was lying in this water and waste, Benjamin attempted to clean her with a paper towel. However, when she turned on a faucet to wet the paper towel, the drain in the middle of the floor began to bubble up with water and overflow. Water and human waste also came out of the floor drain when another person in the bathroom flushed a toilet.
Carr testified that as she entered the basement bathroom on September 13, 1988, she was faced with a partition. As she rounded the partition to enter the main area of the bathroom, she slipped and fell. She initially lost consciousness. When she regained consciousness at the scene of the accident, she was wet and cold and felt pain in her head, neck, back and buttocks. She was taken by ambulance to a local hospital.
The evidence preponderates in favor of the conclusion that the bathroom door was not locked and that there was no "Out of Order" sign on the door or any barricade preventing entry into the bathroom. This conclusion is supported by the testimony of Carr, Catherine Benjamin, and an independent witness, Isabelle Olivier. Olivier corroborated Benjamin's testimony that Carr was lying in dirty water near the floor drain and that the drain overflowed when another woman flushed a toilet. Olivier testified that, following the accident, she saw a man in a uniform close the bathroom door and put up an "Out of Order" sign.
The evidence establishes that the same restroom had flooded the day before, September 12th.
Junious Nora was the Nolmar janitor on duty at the Municipal Court Building on September 13, 1988 between 8:00 a.m. and 2:00 p.m. Nora was also on duty the day before when water came up through the floor drains of the four bathrooms located in the basement of the building. Nora testified that he put "Out of Order" signs on the bathroom doors and "Wet Floor" signs on the hallway floor and then cleaned up the water on the floor. Nora stated that he was unable to lock the bathroom doors to ensure that no one entered these rooms because, of the four rooms, only one men's room had a lock and Nora was never given keys to the restrooms.
Nora testified that he removed the "Wet Floor" signs the next morning because the floor was dry but he claims that he did not remove the "Out of Order" signs on the doors because he was concerned that the basement might flood again. However, Nora admitted that he did not report the basement flooding problem to the City on September 12, 1988 because previous attempts to contact City officials by telephone to report plumbing problems resulted in being put on hold for extended periods of time until he finally hung up each time in frustration from not being able to speak to anyone.
When Nora arrived for work on the morning of September 13, 1988, he claims that he checked the basement bathrooms and all of the floors were dry. He repeatedly stated at trial that the "Out of Order" sign was still on the door of the bathroom in question that morning. Later that morning, as he was proceeding with his cleaning duties, he heard a woman scream in the basement bathroom. He went into the bathroom and saw the plaintiff lying unconscious in the middle of the floor. Nora claims that as he entered the bathroom after hearing the scream, he noticed that the "Out of Order" sign was still on the door. This assertion, however, is contradicted to a certain extent by Nora's previous written statement where he stated "The signs were removed about 8:15 A.M. on Tuesday Sept. 13, 1988."[8] That statement, coupled with the testimony of Carr, Benjamin and Olivier, satisfy us that either Nora removed all of the signs upon arriving at work on the 13th, or they were removed by someone on the night shift. In either case we conclude that Carr had no warnings of the wet floor in the bathroom.
*379 This court also concludes that the City was not notified of this specific sewerage back-up problem before Carr's accident. Nora's testimony is contradictory on this point. Initially he testified that he did not notify the City on either the 12th or 13th. However he also stated that he tried prior to the accident but "they put me on hold and never came out."[9] The record contains a "request for service" form from the City's Department of Property Management which indicates a call by Nora on the 13th reporting that "water is shooting out from floor drains in all three (3) restrooms (in basement) and flooding in hallway." Anthony Moore, supervisor of that department and Edward Zilton, buildings and grounds superintendent for the City, both testified that the call had to have been made on the 13th. We find that a call was placed on the 13th, but more probably than not, after the accident.
We also find, however, that despite the lack of knowledge of this particular flooding incident, the City was well aware of an overall problem in its sewerage system in the Municipal Court Building. Several city plumbers testified of recurring sewer blockage problems.[10] The testimony of Charlene Toney and Loreander Lewis, both Nolmar employees, also corroborated this fact. The record contains several repair requests to the Department of Property Management during 1988, prior to Carr's accident. The evidence preponderates that the eight inch sewer lines servicing the building are not large enough. Fred Liebkmann, a mechanical engineer, testified that the sewer lines are out dated, that back up will occur as a result of blockage from the neighboring Parish Prison, or from an abnormal amount of rain. The Municipal Court Building basement area, being one of the lowest points, will be the first to overflow.
In March of 1988 the City contracted with Nolmar to provide janitorial and cleaning services at the Court Building. The contract sets out Nolmar's obligations and duties with respect to each section of the building. In particular, Nolmar was required to "insure maintenance of a high standard of service" and to keep the building in a "clean, orderly, safe and inviting condition." Subparagraph (2) of paragraph 25 requires "cleanup work made necessary by toilet floods and similar occurrences." Under the heading of "Miscellaneous Requirements" appears the obligation to "Report hazardous conditions and items in need of repair to the Contracting Officer's representative."
On the day of Carr's accident Nora was the only Nolmar employee on duty. Four employees worked the night shift. Nora's normal routine was to check the restrooms upon arrival at work, and then proceed to other parts of the building. Around 12:30 he would again check the restrooms. Nora did not deviate from this routine on September 13 other than remove the "wet floor" signs because the floor was dry. There is no doubt, however, that prior to Carr's accident, the bathroom had again flooded.
For the following reasons, and predicated on the above factual findings, we hold that Nolmar is 70% at fault, the City is 15% at fault, and the unknown "villain" who caused the blockage is 15% at fault.

NOLMAR
The thrust of Nolmar's argument is that its employee, Nora, followed standard procedure on the day of the accident, that there was no deviation from that procedure by him and that he did what the "reasonable man janitor" would have done under the circumstances. Nolmar urges that since a sewer back-up problem is unpredictable it would be unreasonable to have an attendant standing by each restroom facility in anticipation of an overflow.
Nolmar's fault is negligence which requires the traditional duty/risk analysis. *380 In its simplest terms that analysis requires us to determine whether Nolmar had a duty to Carr, whether that duty was breached and if so, whether the breach was a legal cause of Carr's accident and resulting injuries. See, Roberts v. Benoit, 605 So.2d 1032 (La.1991), and the cases cited therein. Duty is the standard of conduct the law imposes on an individual or entity under a given set of circumstances. The scope of one's duty essentially involves a policy determination by the courts under a given set of facts. That is, does the law afford the injured victim protection from another's substandard conduct? The rules of conduct prescribed by the courts or legislative bodies are designed to protect some persons under some circumstances against some risks. Roberts, supra, citing Malone, Ruminations on Cause-In-Fact, 9 Stan.L.Rev. 60 (1956).
Once a duty and a breach thereof have been established, the court must then determine if the breach is a legal cause of the victim's injuries. The Roberts court analyzed legal cause in terms of "proximate cause" and "cause in fact," and concluded that Louisiana has merged the two into an "ease of association" test. Roberts, supra at 1045, 1055. Although not based entirely on foreseeability, the test does encompass that factor. Essentially, the inquiry is "How easily does one associate the plaintiff's complained of harm with the defendant's conduct?" Roberts, supra at 1045, citing Crowe, The Anatomy of a Tort-Greenian, as Interpreted by Crowe who has been Influenced by Malone-A Primer, 22 Loy.L.Rev. 903 (1976).
The determination of Nolmar's duty to Carr in the instant case requires consideration of varying factors including its maintenance contract with the City. Although we agree that the duties assumed by Nolmar in the contract do not necessarily define the standards of its conduct vis-a-vis Carr, those contractual obligations cannot be ignored. The mere fact that Nolmar contracted to perform maintenance services for the City imposes certain duties vis-a-vis third parties. See, Roberts v. State, through DOTD, 576 So.2d 85 (La.App. 2nd Cir.1991), writ den. 581 So.2d 685; Murphy v. State, 475 So.2d 24 (La.App. 4th Cir.1985), writ den. 478 So.2d 906. Of importance is Nolmar's duty to inform the City of "hazardous conditions and items in need of repair." Because Nolmar was in the best position to learn of the flooding condition in the bathroom, it is reasonable for them to bear the burden of alerting the proper authorities. Even without a contractual obligation, the "reasonable janitor" should, at the very least, be required to notify the building owner of a hazard he encounters, especially where the hazard is likely to cause harm. In addition, he also has the duty to take some precautionary measures to warn the users of the facility of the potential hazard. The testimony of Nora, Loreanor Lewis, Nora's supervisor and Robert Donnes, Nolmar's vice-president, all support the idea that under the circumstances of this case merely "mopping the wet floor" is not the extent of the duty owed.
Did Nolmar breach its duty? We conclude that it did. Nora failed to contact the City about the sewerage back-up and consequently the cause of the back-up problem was not corrected. Nora knew this but failed to take and maintain precautionary measures to warn the public. All he did was clean the wet floor. Irrespective of whether you believe Nora's testimony that he did not remove the "out of order sign," the fact remains that it was not on the restroom door the morning of the accident. Nor was any other warning or barricade. Since the problem had not been reported to the City nor corrected, it is reasonable to expect that there would be a high degree of probability of a recurrence within a short time period. This is exactly what occurred. Under those circumstances we hold that Nolmar's duty was to do more than merely "mop up." We find that Nolmar breached that duty by failing to keep the public warned of the problem until the condition was corrected. Contrary to Nolmar's argument, they did not have to post a janitor in every bathroom, only advise the users that it was not properly functioning and that it may create a hazardous situation. Until the City cleared the blockage or corrected the problem those persons using the restroom were at a greater risk than normal. Nolmar knew of those risks and was the logical party to warn the public.
*381 Was Nolmar's breach of its duty a legal cause of Carr's injuries? The duty to notify the City of the sewerage problem has the obvious purpose of getting it corrected. The restrooms become functional again and a dangerous condition is prevented in an area heavily used by the public. Had the City been notified on the 12th and corrected the problem, in all probability there would have been no back-up on the 13th. At the very least the probability of a recurrence would have decreased dramatically.
The purpose of Nolmar's duty to warn the public is so obvious it needs no explanation. Suffice it to say Nolmar was the only party who knew of the back-up problem on the 12th, who knew on the 13th that the problem had not been corrected and consequently should have taken precautionary measures to warn the public. It was definitely foreseeable that the restroom would be used on the 13th, that without the problem being corrected it was highly probable it would occur again, and that the public would be exposed to the risk of slipping and/or falling. We can therefore easily associate Mrs. Carr's accident and injuries with Nolmar's failure to notify the City and its failure to warn the users of the restroom.

THE CITY
We also find that the City was negligent.[11] The record satisfies us that the Municipal Court Building had experienced an abnormal amount of sewerage back up problems for sometime prior to Carr's accident. The cause of the problems range from various articles being thrown into the system to the inadequacy of the system itself. Liebkemann's testimony and that of the City's plumbers substantiate this fact. Despite knowledge of this problem there is an absence of evidence indicating any corrective or preventative measures by the City. In fact, the evidence shows that neither Nolmar nor the City could have taken the simple precautionary measure of locking the bathroom. Either the bathroom had no lock or the keys have been lost for a long time.[12]
Although we cannot determine the exact cause of the back up on the 13th, we are satisfied that the City's knowledge of a general sewerage problem made it reasonably foreseeable that a dangerous condition would result and the risk of harm to the public was heightened. The City did nothing other than contract with Nolmar for routine maintenance services. For its failing to take at least minimal action, we find the City to be 15% at fault.

PHANTOM TORT FEASOR
An eight inch sewer line is, no doubt, sufficient under normal circumstances. However, the record establishes that the line servicing the Municipal Court's Building is inadequate because it also receives outflow from the Parish Prison complex area. Quite simply, it is not big enough. Logically, because of its inadequate size and the volume of sewerage it must transport, there is a greater than normal propensity for blockage. And, of course, the line doesn't block on its own. The City's plumbers testified about a variety of articles they had removed in the past when clearing a blockage. It is more probable than not that an unknown person or persons threw some foreign object into a toilet which caused the back-up and overflow. The "reasonable man" should foresee that blockage and flooding would occur from such conduct. We conclude that the conduct of the unknown "villain" was substandard, was a breach of his duty to act reasonably and created an unreasonable risk of harm to others using the restroom facilities. Accordingly, we assign 15% of the fault to that person or persons.

INDEMNITY CLAUSE
The City argues in its brief that, under its contract with Nolmar, Nolmar has a *382 contractual obligation to indemnify the City for any damages sustained as a result of Nolmar's operations. Under Louisiana law, an indemnification agreement will not be construed to cover losses arising from an indemnitee's own negligence unless mutual intent to provide such indemnification is expressed in unequivocal terms. Federal National Mortgage Association v. Sethi, 557 So.2d 354 (La.App. 4th Cir.1990). A reading of the indemnity clause in the Nolmar/City contract reveals that it does not expressly state that Nolmar owes indemnity to the City for the City's own fault. Because we find the City to be partially at fault, there is no merit to this argument.

DAMAGES
Florida Carr was forty-seven years old at the time of the accident. Testimony at trial established that she had a very active lifestyle before the accident. She was a hard worker who worked several different jobs including a cooking job at a Holiday Inn, a job in insurance sales as well as being an Avon representative and a caterer. At the time of the accident, Carr testified she was working twenty to thirty hours a week at the Holiday Inn, thirty to fifty hours a week at her insurance job, ten to fifteen hours a week at her Avon job and varying amounts of time per week at her catering job. Much of her work was physically demanding.
Additionally, Carr frequently engaged in recreational activities, was involved in her church and had an active social life. Carr also spent much of her time caring for one of her adult sons, Regia Hargrove, who has serious mental problems and requires much supervision.
Following the accident, Carr was brought to the Hotel Dieu emergency room but was released later the same day. Approximately one month after the accident, on October 16, 1988, plaintiff sought treatment from Dr. Ralph Gessner, an orthopedic surgeon, for continuing neck and back pain from the accident. Dr. Gessner testified that plaintiff's medical records indicated that she had made two visits to an emergency room between the accident and the date of her first visit to him.
Dr. Gessner conducted an examination of Carr and found significant areas of injury to her neck and lower back with moderate spasms in both areas. Plaintiff had no history of neck or back problems before the accident. An x-ray of the lumbar spine showed spondylolisthesis at the L5-S1 level which Dr. Gessner described as the slippage of one vertebra onto another. According to Dr. Gessner, this was a congenital condition which became symptomatic as a result of her accident on September 13, 1988.
Over the next two years, plaintiff was hospitalized several times by Dr. Gessner for diagnostic tests including several CT scans and myelograms and for conservative treatment of her back injury. Dr. Gessner's diagnosis in early 1989 was that plaintiff was suffering from acute lumbosacral strain superimposed on spondylolisthesis as well as resolving cervical strain. His opinion was that plaintiff was completely disabled from working.
When plaintiff was hospitalized in February 1990, another myelogram was performed which showed mobile spondylolisthesis at the L5-S1 level and asymmetry to the nerve root which suggested a disc problem. Based on the results of this myelogram as well as plaintiff's continuing muscle spasms and significant back pain after two years of conservative treatment, Dr. Gessner performed fusion surgery at the L4-L5 and L5-S1 levels on June 21, 1990 to stabilize plaintiff's spine. According to Dr. Gessner, the accident caused the spondylolisthesis to become mobile and the surgery was needed to stop this movement.
Following the fusion plaintiff was immobilized in a brace for six months. Although the surgery was successful in reducing Carr's pain, Dr. Gessner stated that she has a very low tolerance for physical activity. Dr. Gessner's opinion is that physical activity will continue to cause Carr pain and this condition will be permanent. Carr will need continuing treatment and medication for pain. Dr. Gessner suggested that Carr visit an internist twice a year for this treatment. He also estimated the cost at $200.00 per year.
Dr. Gessner stated that Carr is totally disabled from working and has an anatomical *383 disability rating of 20% for her whole body and 40% for her back. His opinion is that the injuries Carr sustained on September 13, 1988 are more likely than not the cause of her back symptoms, her subsequent surgery and her permanent disability.
Dr. Leighton Stamps, a psychologist, treated Carr on five occasions following the accident and diagnosed her as suffering from major depression caused by her injuries and the resulting changes in her life. He made this diagnosis after conducting several tests and interviews. Dr. Stamps stated that Carr needs ongoing therapy for an indefinite period of time and recommended a minimum treatment period of two years with visits once every two weeks. Dr. Stamps stated that he charges $85.00 per hour for his services.
The defense countered the testimony of Dr. Stamps with the testimony of Dr. Herman Colomb, a psychiatrist. Dr. Colomb examined Carr only once and testified that, in his opinion, Carr does not suffer from severe depression but, rather, only has mild anxiety problems which should not prevent her from working.
After reviewing the testimony of both mental health professionals as well as the testimony of Carr and her sister on the issue of Carr's mental state, we find that the evidence preponderates in favor of the conclusion that Carr suffers from severe depression as a result of her accident and injuries. Furthermore, we accept Dr. Stamps' recommendation of future psychological treatment needed by Carr.
Dr. Cornelius Gorman, a vocational rehabilitation expert, evaluated Carr on March 6, 1990 and continued to evaluate her for another year. His continuing vocational diagnosis throughout this period was that Carr's medical and emotional condition prevent her from working. He stated his opinion that her inability to compete in the labor market is due to the sequence of events which began with her injury of September 13, 1988.
The defense countered this testimony with the testimony of Dr. Craig Feldbaum, a psychologist and vocational rehabilitation expert. Dr. Feldbaum's three evaluations of Carr all took place before her fusion surgery. His opinion is that Carr's range of potential occupational placement has been extremely narrowed but she could hold a job involving only telephone use such as sales or solicitations.
Evaluating the evidence on this issue, we conclude that Carr is occupationally disabled as a result of her injuries from the September 13, 1988 accident.
Dr. Seymour Goodman, an economics expert, reviewed Carr's earnings records to estimate her loss of earning capacity as a result of the injuries sustained on September 13, 1988. His estimate of Carr's total economic loss also included the value of her household services. Relying on income tax returns, life expectancy and work life expectancy tables, minimum wage rates and tables reflecting the average rate of increase in medium earnings, Dr. Goodman estimated Carr's past economic losses as follows: $61,428.54 for past lost wages, $2,130.31 for past loss of fringe benefits and $11,915.60 for past loss of value of household services for a total of $75,474.45. He estimated her future economic loss, if permanently disabled from working, as follows: $201,450.38 for future lost wages, $7,232.42 for future loss of contribution to health insurance and $81,419.21 for future loss of value of household services for a total future economic loss of $290,102.01. The total of Carr's past and future economic loss according to Dr. Goodman's estimate is $365,576.46. According to Dr. Goodman, that total figure would be adjusted to $306,946.02 if Carr were able to return to gainful employment at minimum wage with the only difference being a reduction in the future lost wages figure from $201,450.38 to $142,819.94.
The defense countered Dr. Goodman's testimony with that of Dr. Kenneth Boudreaux, another economics expert. Dr. Boudreaux was not asked by the defense to include the value of Carr's household services in his estimate of her economic loss. Relying on factors including income tax returns and work life expectancy tables, Dr. Boudreaux estimated Carr's past economic loss at $36,022.32 and her future economic loss, if totally disabled, at $117,066.18.
Considering all of the evidence we award Carr the following special damages:

*384
Past Medical Expenses: $ 76,572.74
Future Medical Expenses: 5,000.00
Past and Future Lost Wages: 262,878.92
Past and Future Lost Fringe
Benefits: 9,362.73
Past and Future Loss of
Value of Household Services: 50,000.00
 ___________
TOTAL SPECIAL
DAMAGES: $403,814.39

We also find that the evidence supports a general damages award of $325,000.00.
With regard to damages suffered by Regia Hargrove, plaintiffs offered the testimony of Dr. Philip Schaeffer, a psychiatrist, who examined Hargrove and opined that he suffers from residual post-traumatic stress disorder secondary to abuse by his father, anti-social personality disorder and schizotypical personality disorder. Although these conditions pre-existed the accident, Dr. Schaeffer stated that Hargrove is extremely dependent on his mother and requires much supervision. Dr. Schaeffer's opinion is that Hargrove cannot hold a job or maintain his own home without supervision. In the absence of supervision, Dr. Schaeffer recommended that Hargrove undergo treatment at a rehabilitation center in order to acquire independent living skills. He estimated the cost of this treatment at $12,000.00 to $20,000.00 per month.
The defense countered this testimony with the testimony of Dr. Colomb. He stated that although Hargrove has been suffering from chronic mental illness for years, he does not think Hargrove needs to be institutionalized and noted that Hargrove has not received constant supervision in the past.
After reviewing evidence regarding the damages suffered by Regia Hargrove as a result of his mother's accident and limitations caused by her injuries, we conclude that he should be awarded $20,000.00 for loss of his mother's services.

DECREE
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment in favor of Florida Carr and Regia Hargrove in the amounts of $728,814.39 and $20,000.00, respectively, plus legal interest from judicial demand and all costs, and against Nolmar Corporation, Continental Casualty Company and Valley Forge Insurance Company, and the City of New Orleans, for their respective proportions of the fault, 70% to Nolmar and 15% to the City.
It is FURTHER ORDERED, ADJUDGED AND DECREED that the liability of Nolmar (and its insurers) and the City is joint, divisible and in solido for up to 50% of the plaintiffs' damages in accordance with Civil Code Article 2324 and the Supreme Court's decision in Touchard v. Williams, 617 So.2d 885, (La.1993). All rights of contribution are reserved.
The judgment of the trial court is vacated.
VACATED AND RENDERED.
CIACCIO, J., dissents with reasons.
CIACCIO, Judge, dissenting.
I respectfully dissent from that portion of the judgment that holds the City of New Orleans liable for 15% of the damage award.
The liability of the City is predicated upon its knowledge of a periodic sewerage backup problem and its failure to take any corrective or preventative measures, including a failure to provide keys to lock the bathroom. Finally, the majority finds the City at fault because it did nothing other than contract with Nolmar for routine maintenance services.
The opinion fails to recognize that this janitorial contract placed the entire responsibility for the handling of "accidents", mopping of wet floorsrain waterservicing of toilet rooms (Contract, Art. 21, p. 18) upon Nolmar. Nolmar's personnel were to be permanently stationed in the building. They were the only parties on the premises with the responsibility for maintaining the restrooms in a clean and safe condition. The contract price was $61,963.20 per monthnot an insignificant amount. The contract amounted to a transfer of the garde of the building to Nolmar.
The contract further provided that Nolmar:
... shall furnish the utility man-hours ... [for] cleanup work made necessary by toilet *385 floods and similar occurrences (Paragraph 25A(2) and
report hazardous conditions and items in need of repair to the contracting officer's representative. (Paragraph 26F).
Thus the City had made provisions for the handling of toilet floodsit was Nolmar's responsibility to clean up and report the problem to the City, who then had the responsibility to repair.
There is no contention that the sewerage backup was a daily occurrence. The majority correctly found that Nolmar did not call the City to report this problem. Nolmar's employee failed to put up warning signs or wet floor barricades or do anything to warn of the danger. Mrs. Carr testified that she would not have entered the restroom if any warning sign had been in place.
As did the jury, I find that the City is blameless for Mrs. Carr's injuries. I would assess fault in accordance with the jury verdict.
NOTES
[1] It was entirely proper for both the jury and judge to apportion fault to all tortfeasors irrespective of whether they are parties to the lawsuit or not. La.C.C.Pro. Art. 1812; Lemire v. New Orleans Public Service, Inc., 458 So.2d 1308 (La.1984).
[2] Only the City briefs the damage issue in its appellant's brief.
[3] In brief, the plaintiff, among her assignments of error, only argued the court erred in not casting Nolmar for 100% of the fault and, alternatively for not correcting the judgment to reflect the City's responsibility to them. A subsequent letter to this Court advised that all but these two assignments were waived.
[4] We recognize, as did the McCullough panel, the supposed different approach adopted by the First and Third Circuits which requires a determination of which fact finders conclusions are more reasonable.
[5] We have combined the damage award to each plaintiff for explanation purposes.
[6] Although the City is only 33 1/3% at fault, since its fault is greater than the plaintiffs and since it is a joint tortfeasor with Nolmar, it is liable in solido for up to 50% of plaintiffs damages. C.C. Art. 2324.
[7] The author of this opinion notes that a de novo determination by this court effectively deprives the litigants (plaintiffs and Nolmar) of their right to a jury determination. Although the right to a civil jury trial is not a constitutional right, it is a statutory right that has been zealously protected by our courts. I strongly suggest that under the circumstances of this case, judicial economy does not outweigh the right to a jury determination.
[8] Nora explained the apparent contradiction by testifying that the statement referred only to the "wet floor" signs.
[9] Quite candidly we can't determine from Nora's testimony whether he was speaking of some prior incident where he allegedly called the City or whether it was the incident on the 12th. In either case we are satisfied the City was not notified prior to Carr's accident.
[10] Lawrence Kabel and Peter Tatum, city plumbers, testified as to numerous sewerage back ups prior to September 13, 1988. Allen Staples, the supervisor of the City's plumbing department, stated that he was familiar with problems of blocked sewer lines causing drains to back up in the Municipal Court Building.
[11] From the evidence presented we cannot say that the Municipal Court Building is defective because of the sewer lines. We are not completely satisfied that the lines are owned by the City. Most probably, they are owned by the Sewerage and Water Board. Therefore, we do not premise any of the City's fault on Article 2317.
[12] Nora testified that the bathroom had no lock. Loreander Lewis, Nolmar's supervisor in 1988, testified that there were no keys to the bathroom. Calvin Williams, who oversees the City's custodial department, testified that he gave keys to the building to a Nolmar representative, but did not think they included keys to the bathroom.