934 So.2d 766 (2006)
Julie HUSSEY, Gerald Hussey Individually and on Behalf of Their Minor Children, Kellie Hussey and Kimberly Hussey
v.
Darlene RUSSELL, Individually, and on Behalf of the Estate of Bryan Vidrine, Bryan Russell, Darlene Russell, Daniel Vidrine, State of Louisiana, Through the Department of Transportation and Development, City-Parish of East Baton Rouge, State Farm Mutual Automobile Insurance Company and U.S. Agencies Casualty Insurance Co., Inc.
Darlene Russell, Individually and on Behalf of Her Minor Son, Bryan Vidrine
v.
State of Louisiana, Through the Department of Transportation and Development, City of Baton Rouge/Parish of East Baton Rouge, Julie E. Hussey, U.S. Agencies Insurance Company, and State Farm Fire & Casualty Insurance Company.
Nos. 2004 CA 2377, 2004 CA 2378.
Court of Appeal of Louisiana, First Circuit.
March 29, 2006.
Writ Denied June 14, 2006.
*768 Karl J. Koch, Baton Rouge, Counsel for Plaintiff/Appellee Darlene Russell.
Frank Tomeny III, Jason L. Melancon, Baton Rouge, Counsel for Plaintiffs/Appellees Julie Hussey, Kimberly Hussey, and Kellie Hussey.
E. Wade Shows, Ronnie J. Berthelot, Carlos A. Romanach, Special Assistant Attorneys General, Baton Rouge, Counsel for Defendant/Appellant State of Louisiana, through The Department of Transportation and Development.
Before: PARRO, WHIPPLE, McDONALD, WELCH, and HUGHES, JJ.
HUGHES, J.
This appeal arises from an automobile accident in which the state was held partially liable because of the condition of the roadway. The primary issue on appeal is the degree of fault of the state. For the reasons that follow, we affirm the judgment in part, amend the judgment in part, and affirm as amended.

FACTS AND PROCEDURAL HISTORY
This suit arose from an accident in which fifteen-year-old Bryan Vidrine lost control of his vehicle on Louisiana Highway 3034, Wax Road, veering off the roadway, then back onto and across the center line of the highway, striking a vehicle driven by Julie Hussey, whose passengers were her daughters, Kellie and Kimberly Hussey. Bryan Vidrine was killed. Mrs. Hussey and her daughters were injured.
Two lawsuits were later filed; one by Mrs. Hussey and the other by Bryan Vidrine's mother, Darlene Russell. The suits were subsequently consolidated for trial, and one of the issues tried was the liability of the Louisiana Department of Transportation and Development ("DOTD") for the allegedly defective condition of the roadway. It was alleged that the portion of Hwy. 3034 at issue in this case had drop-offs in excess of three inches.
A jury determined that DOTD was 20% at fault and Bryan Vidrine was 80% at fault in causing the accident. Mrs. Russell was awarded $500,000.00 in general damages and $11,000.00 in funeral expenses. Mrs. Hussey was awarded $200,000.00 in general damages, $228,139.00 in special damages, and $293,000.00 for loss of earning capacity. In accordance with the percentages of fault assigned, judgment was rendered against the state in favor of Mrs. Russell in the amount of $102,200.00 *769 and in favor of Mrs. Hussey in the amount of $144,227.80, together with legal interest.
It was stipulated that the claims of Kellie and Kimberly Hussey did not exceed the $50,000.00 jury trial amount, and the trial judge alone tried them. With respect to these claims, the trial judge assessed 35% fault to DOTD and 65% fault to Bryan Vidrine, and $50,000.00 was awarded as damages to each of the girls.[1] Taking into account the percentage of fault assigned to the state, the judgment awarded $17,499.99 each to Kellie and Kimberly Hussey,[2] together with legal interest. Additionally, all plaintiffs were awarded certain special costs against DOTD.
The state has appealed, asserting the trial court erred in finding Hwy. 3034 unreasonably dangerous, in allocating 35% fault to DOTD for Kellie and Kimberly Hussey's damages, in certain evidentiary rulings, and in allocating all costs to DOTD when it was assigned only 20% fault by the jury. Both Mrs. Russell and Mrs. Hussey have answered the appeal and ask for a greater allotment of fault to DOTD, and in the alternative, ask this court to "harmonize" the different assessments of fault made by the jury and trial judge as to DOTD.

DISCUSSION AND ANALYSIS

Evidentiary Rulings and Negligence of DOTD
Appellant contends the trial court committed legal error when it allowed plaintiffs to "mention, use, offer, file, introduce into evidence and publish" to the jury a DOTD intraoffice memorandum appellant claims is shielded from discovery and evidence by 23 U.S.C. § 409.[3] Appellant *770 further contends the trial court erred in precluding DOTD from "mentioning, introducing or cross-examining" any witness with statements made in the petition for damages filed on behalf of Mrs. Hussey.
Appellant correctly states that certain data that has been gathered in connection with highway safety improvement projects utilizing federal funds is protected from discovery or evidentiary use, as provided more fully in 23 U.S.C. § 409, which states:
Notwithstanding any other provision of law, reports, surveys, schedules, lists, or data compiled or collected for the purpose of identifying, evaluating, or planning the safety enhancement of potential accident sites, hazardous roadway conditions, or railway-highway crossings, pursuant to sections 130, 144, and 148 of this title or for the purpose of developing any highway safety construction improvement project which may be implemented utilizing Federal-aid highway funds shall not be subject to discovery or admitted into evidence in a Federal or State court proceeding or considered for other purposes in any action for damages arising from any occurrence at a location mentioned or addressed in such reports, surveys, schedules, lists, or data.
However, the legal error implicated by introduction of such evidence at trial in violation of this statute may be said to be harmless where there was sufficient other evidence introduced, excluding the inadmissible Section 409 evidence, to establish that the roadway at issue was unreasonably dangerous. See Badeaux v. State, Dept. of Transp. and Development, 96-853, p. 8 (La.App. 5 Cir. 2/25/97), 690 So.2d 203, 207, writ denied, 97-0779 (La.5/1/97), 693 So.2d 733.
We find in the instant case that the evidence presented, excluding the evidence objected to by DOTD, was more than sufficient to establish by a preponderance of the evidence that the portion of Hwy. 3034 at issue was unreasonably dangerous to motorists. We note also the evidence objected to did not address or mention a specific location.
Melanie Sinclair Williams testified that on the day of the accident she turned onto Wax Road, traveling behind a white Toyota Camry, which she later found was driven by Bryan Vidrine. Melanie testified that she did not know Bryan Vidrine, but that she took note of his vehicle because she had one just like it. Melanie further testified that at the time, a heavy rain had just passed through the area, but she considered that it was then safe to drive. Further, Melanie stated that she was traveling between forty-five and fifty m.p.h. when the posted speed limit was forty-five m.p.h., and that she was "gaining on him." Melanie noticed that the Vidrine vehicle had its "running lights" on.
Melanie explained that she had grown up in the "Central" area and was familiar with the curve toward the right that the Vidrine vehicle was approaching. She described the curve as sloping to the right and indicated that because of the slope of the roadway, a motorist traveling there feels his vehicle being pulled to the right. Melanie testified that such a motorist has to steer to the left to compensate for this pull.
As the Vidrine vehicle entered the curve, Melanie saw the right tires of his car drop off the right side of the road "into *771 a rut" and immediately afterwards she saw Vidrine lose control of his car. Melanie brought her vehicle to a stop "to see what was going to happen." She then witnessed the Vidrine vehicle fishtail while "straddling the middle line" and move back toward the right lane, possibly leaving the roadway a second time, when it began to slide with the driver's side of the car facing her. At this moment, Melanie testified that a blue truck impacted the Vidrine vehicle and "it was a big explosion."
Melanie also testified that there was an incline in the roadway and "where the roadway came down" there was a puddle of water that "gives the illusion of a roadway." When asked whether from her vantage point, it appeared that the Vidrine vehicle was "running off the road," Melanie answered negatively and stated that it looked like he was driving "in a normal manner." When the Vidrine vehicle encountered the area with standing water, Melanie testified that she saw a splash.
Melanie went on to say that she pulled her vehicle "somewhat on the side of the road" while witnessing the accident, at about the point where "he dropped off," and that when she later moved her car she had to drive for "some time to get back up on to the roadway . . . [b]ecause the tire [of her car] was stuck in the rut." However, Melanie stated that immediately after the accident she did not move her car, but jumped out to assist the accident victims; she did not recall whether she stepped into a puddle on getting out of her car.
Melanie testified at trial that the roadway had remained in the same condition as on the day of the accident. She further identified photographs introduced into evidence as Exhibits J-5AG as accurately depicting the accident site. Melanie indicated that she went out to the scene at the time the photographs were taken and identified herself as appearing in Exhibit J-6A. She stated that on the day the photographs were taken, the condition of the roadway was the same as on the day of the accident.
Melanie further testified that following the accident the state trooper investigating the accident asked her to point out where the Vidrine vehicle left the road, which she did from a church parking lot, but she was not asked to walk back to that location and show it to him with specificity. She also testified that she gave the trooper a written statement, which was written out by her sister, though Melanie signed it herself. She further stated that she has since seen the accident report and indicated that her statement was not attached. Melanie stated that she did not see anything untoward in Bryan Vidrine's driving until his tire when off the road.
On cross-examination, Melanie was asked to verify that the defense photographs, Exhibits DOTD-1 through 22, accurately reflected the accident site, which she did. She was then asked to look through the photographs and identify the one that depicted the area where the Vidrine vehicle first left the road. Melanie testified that none of the defense photographs she was presented showed the site closely, but that DOTD-10 contained a view of the curve at issue "from a distance." Melanie identified Exhibit J-6B as showing the point just before "Old Wax Road" where Bryan went off the road.[4] *772 Melanie admitted that the double yellow centerline was clearly visible on the day of the accident, but stated that the white side stripe was visible only in some areas.
The testimony of the investigating officer for the accident, Ross Johnson, was presented via deposition. Mr. Johnson had been a Louisiana State Trooper for approximately thirteen months at the time of the 1996 accident, and worked as a trooper from 1995 through 1998. At the time his deposition was taken, Mr. Johnson resided in South Dakota. Mr. Johnson arrived on the scene of the accident approximately thirty minutes after its occurrence; fire rescue, ambulance, and sheriff's department personnel were already on the scene. Some time after his arrival, Mr. Johnson's shift supervisor, Lieutenant Bill Cook, arrived and assisted in completing the accident report. Mr. Johnson did not have absolute recall of the facts surrounding his investigation, but indicated that he thought he had taken the photographs. Mr. Johnson could not recall whether he asked Melanie Sinclair Williams for a handwritten narrative of what she witnessed, but he indicated he did not have a copy of any such statement attached to the accident report. Mr. Johnson related that Melanie Sinclair Williams was the only witness to the accident and that she told him she saw the Vidrine vehicle "run off the road," then fishtail through both lanes of travel, and collide with another vehicle. Mr. Johnson indicated Melanie pointed out the location where Bryan Vidrine's car left the roadway; he does not recall her walking back to the location with him. Mr. Johnson testified that he could locate physical evidence that the Vidrine vehicle left the roadway only once prior to the impact. No measurement of lane width, slope, or shoulder drop-off was made by Mr. Johnson.
John Rigol, Jr. was called to testify as an expert accident reconstructionist on behalf of the plaintiffs. Mr. Rigol testified that he previously worked as a Jefferson Parish Deputy Sheriff and with the Louisiana State Police. He retired from the state police as Commander of the first Accident Reconstruction Unit, having formed the unit from its inception. Mr. Rigol identified a diagram introduced into evidence as Joint Exhibit 10, which depicted the accident site; he stated that the Vidrine vehicle left the roadway between the points on the diagram marked "X" and "Y," as related to him by Melanie. In Exhibit J-6A, Melanie is depicted as indicating the location where the Vidrine vehicle left the roadway. With reference to Exhibit J-6B, Mr. Rigol testified that the lady in the orange vest was standing at point "X" and the lady dressed in blue was standing at point "Y," and it was between these two points that Vidrine left the roadway. He further stated that Exhibits J-6C and J-6D show a close-up of the ladies standing at points "X" and "Y," and that Exhibits J-6E and J-6G are photographs of the area between those two points. Mr. Rigol stated that the distance between points "X" and "Y" measures 115 feet. He further testified that he placed the pink and yellow paint reflected in the photographs on the roadway to mark the points at issue. Mr. Rigol also testified that he measured depths between points "X" and "Y," and that the measurement of the "drop-off" in that location was between two and one-quarter inches and four and three-eights inches, with an average depth of three inches. Mr. Rigol further testified that in this area of the highway, there were areas in which the edge of the roadway *773 was broken up, as depicted in Exhibit J-6E.
In the opinion of Mr. Rigol, the primary contributing factors to this accident were puddling of water in and off the roadway that filled in the sloping area of the roadway, the uneven edge of the roadway, the uneven surface of the shoulder, and the "drop-off." Mr. Rigol further indicated that the curve has what is called an "irregular radii" or a non-uniform arc to the curve, which he explained causes a driver to change steering directions several times while negotiating the curve. In a uniform curve, Mr. Rigol explained that a driver can set his steering wheel going into the curve and coming out of the curve, and does not need to alter his steering throughout the curve. Mr. Rigol indicated that the Vidrine vehicle left the roadway near the mid-point of the curve.
On cross-examination, Mr. Rigol agreed that inattention or driver error on the part of Bryan Vidrine contributed to his leaving the roadway. Mr. Rigol further agreed that the double yellow line in the center of the road was clearly visible and could have served as a reference point for Bryan Vidrine in positioning his vehicle on the roadway.
James R. Clary, Sr. testified as an expert in the field of Engineering and Highway Safety and Maintenance. Mr. Clary testified that he is a civil engineer and land surveyor, and that he worked in excess of twenty years in the design and construction of streets and highways, and he currently works as a consultant evaluating highway design, safety, signage, and maintenance, with reference to published industry standards.
With respect to this accident, Mr. Clary was provided with Mr. Rigol's measurements and the police report data, and he also went out to the site and performed his own measurements. Mr. Clary correlated and compiled the data onto a map, which was introduced at trial.
Mr. Clary testified that the road in question was originally constructed in 1955, according to plans that called for two ten-foot wide lanes with two five-foot wide shoulders, for a total width of thirty feet. Mr. Clary further testified that in 1977 there was another construction project on this road that called for two twelve-foot lanes and two two-foot shoulders, for a total roadway width of twenty-eight feet. Mr. Clary explained that during the intervening time the failure to maintain the roadway resulted in the loss of width.
Mr. Clary further attributed the loss of width to a failure to stabilize the inside of the curve as required by the American Association of State Highway and Transportation Officials ("AASHTO") guidelines. According to Mr. Clary, the AASHTO Maintenance Manual states that the inside of a curve should be stabilized where there is evidence of motorists "cutting the curve" and going off the pavement. Mr. Clary read from the manual the following: "`[T]he area on the inside of curves for a width of several feet should be better stabilized than other shoulder areas because of vehicles cutting the curves. Earth, sod, and gravel shoulder areas are sometimes paved on the inside of curves to prevent a hazard condition. Shoulder areas that settle or sink should be inspected for drainage problems.'" Mr. Clary stated that the inside of the curve at issue in this case was not reinforced as recommended by AASHTO.
"Cutting the curve" was described by Mr. Clary as driving the right wheels of a vehicle off the pavement onto the shoulder, which he stated beats down the shoulder and causes the shoulder material to be displaced laterally to form a rut and a dam. He further stated that a rut would *774 let water run longitudinally along the highway to a low spot for drainage, but that the roadway should be built like a roof so that water drains off directly into the adjoining ditch. The improper drainage situation allowed water to pool onto the edge of the roadway, impacting motorists who encounter the water by imposing a right-sided drag on the vehicle.
Mr. Clary also measured the drop-off in the pertinent location as ranging from two and one-quarter inches to four and one-half inches. He stated that shoulder edge drop-off studies indicate that in order to safely reenter a roadway from this range of drop-off depths, a very low speed is required; i.e. between twenty and thirty m.p.h.
Mr. Clary also confirmed the testimony of Mr. Rigol that the curve in question has a changing radius. He also recognized that the undulating curve makes driving more difficult because a motorist expects a "normal" curve, so the changing curvature contributes to driving off onto the shoulder.
Mr. Clary further testified from his prior experience as a former employee of DOTD that the department employs road inspectors, whose job it is to inspect on a regular basis the roads in their districts. Mr. Clary stated that shoulder drop-offs in excess of three inches are normally scheduled for repair, while drop-offs approaching five inches are considered hazardous and should be repaired immediately.
Mr. Clary measured the actual width of the lane in which Bryan Vidrine was driving at the time of the accident to be ten feet, six inches between the double yellow centerline and the white fog line. On cross-examination, Mr. Clary was asked whether the five to six foot wide car Bryan Vidrine was driving on the day of the accident could have passed through the curve if he had maintained a reasonable distance from the yellow centerline, and he indicated that the lane width was sufficient to accommodate such a car. Mr. Clary was further asked as to the proper procedure a driver should take when the wheels of his vehicle drop off the edge of the road. He stated that such a driver should not attempt to "jerk" his car back onto the road but to continue riding down the road while losing speed and then attempt a reentry onto the roadway. He did not recommend slamming on the brakes.
Calvin Thornton, a DOTD employee in East Baton Rouge Parish, testified that there are approximately 360 miles of state highways in the parish. Mr. Thornton stated that he had over twenty years experience as an employee of DOTD and held the position of Parish Maintenance Superintendent; all maintenance crews in the parish reported to him. Mr. Thornton testified that it is part of his job to inspect the roads in the parish, looking for potholes, drop-offs, ruts, or anything that would endanger the motoring public, and to order necessary repairs. When presented with the photographs of the accident site and asked whether he could see anything that needed repair, he denied that any repairs were indicated. Mr. Thornton testified that according to his maintenance manual a three-inch rut would be "just minor" and "[f]ive inches is a priority." Mr. Thornton also stated that if he saw a three-inch roadway drop-off, he would have it repaired, but indicated that Medric Stein was the maintenance superintendent at the time of the accident. Mr. Thornton also indicated that even though a rut is repaired, damage can occur quickly to reproduce a rut in as little as two to three days "[b]ecause traffic steadily runs off the road."
Richard Savoie was called to testify as an expert in Civil Engineering and Design. He stated that he works in the DOTD road *775 design section as a Project Development Engineer supervising four design groups that do design work for the department; he supervises work all over the state. With respect to Wax Road, Mr. Savoie produced a document detailing the history of the road, which was introduced as Exhibit DOTD-24. Mr. Savoie described the curve following the 1977 widening project as "a 575 foot ... continuous curve with a radius of over fourteen hundred feet." Mr. Savoie indicated that he has driven through the curve and examined the photographs offered into evidence by the plaintiffs and found no deviation from the curve depicted in the DOTD diagram offered into evidence as Exhibit DOTD-27. However, Mr. Savoie indicated he did not make any measurements of the curve himself.
Joseph D. Blaschke testified as an expert witness in Civil Engineering on behalf of DOTD. It was the opinion of Mr. Blaschke that the accident in question was primarily caused by the Vidrine vehicle losing control, which he attributed to "oversteering" by Bryan Vidrine. Mr. Blaschke questioned the allegations that the Vidrine vehicle actually left the roadway, stating that a re-entry onto the roadway would have caused the ground to be pushed up and mud to splatter. He indicated there would have been "a lot more disturbance than what the police officer actually found." Mr. Blaschke drove through the curve and described it as a "gentle curve," though he could not contradict the testimony of Clary or Rigol that there were variations in the curvature. Blaschke stated only that if there were variations in the radius, it was "not a problem in this particular curve."
Based on the testimony presented without reference to the evidence DOTD claims should have been excluded under 23 U.S.C. § 409, we find that there was a reasonable basis upon which the trial court could have found fault on the part of both DOTD and Bryan Vidrine in contributing to the instant accident. Therefore, we find any error in the admission of the evidence objected to by DOTD was harmless. Similarly, we find no reversible error in the trial court's refusal to allow DOTD's counsel to examine Mrs. Hussey concerning the allegations relative to fault made in her original, unverified petition. We further find no manifest error in the factual findings of the trial court.

Inconsistent Judge and Jury Allocations of Fault
Having found that the factual findings of the trial court on the issue of the degree of fault of the state were not manifestly erroneous, we must address appellees' alternative assertions in their respective answers; i.e., that the differing judge and jury assessments of fault must be resolved. In support of this contention, appellees cite this court's opinion in Cornish v. State, Dept. of Transp. and Development, 93-0194 (La.App. 1 Cir. 12/1/94), 647 So.2d 1170, writs denied, 95-0547, 95-0574 (La.5/5/95), 654 So.2d 324, wherein the following is stated:
[W]e must . . . determine whether the findings of fault and apportionment of fault by the trial judge and the jury are reasonable and not manifestly erroneous. In the event that this court finds that the findings of both as to any particular determination are manifestly erroneous, this court is free to evaluate the facts de novo, and after a review of the complete record, make our own findings as to that particular determination. If in initially applying the manifest error test to the findings of the factfinders, this court concludes that a finding by one of the factfinders was manifestly erroneous, but the finding of the other is *776 not, then we are free to disregard the finding of the factfinder that was manifestly erroneous. In other words, we would eliminate the clearly wrong finding and be left with only one reasonable finding. In the two previously mentioned scenarios, there would be no need for this court to apply the additional standard of review established in Thornton II [Thornton v. Moran, 348 So.2d 79, 81-82 (La.App. 1st Cir.), writs denied, 350 So.2d 897, 898, 900 (La.1977)] because we would not have reasonable findings that are inconsistent.
The Thornton II standard should be applied only after an appellate court is satisfied that the record contains sufficient evidence to furnish a reasonable factual basis to support the conclusions reached by each trier of fact and that these conclusions are inconsistent, thus requiring harmonization to arrive at a single decision.
Cornish v. State, Dept. of Transp. and Development, 647 So.2d at 1178-79 (citations omitted).[5]
Because the judge and jury in this case assigned different percentages of fault to DOTD, the jurisprudence of this circuit requires that the inconsistency must be addressed.
After a thorough review of the evidence presented in this case, we believe the 35% fault assigned to DOTD by the trial judge was the more reasonable finding. We believe the trial judge made the "more reasonable measurement" of the evidence. Thornton v. Moran, 348 So.2d at 82. According to the eyewitness testimony, Bryan Vidrine was not speeding or driving in any questionable manner before he left the roadway and encountered the rutted roadway edge obscured by standing water. Therefore, we amend the judgment to allocate 35% of the fault in the instant accident to DOTD and 65% fault to Bryan Vidrine.
Accordingly, the judgment rendered against DOTD is hereby amended to award Mrs. Russell $178,850.00 (35% of $511,000.00), and to award Mrs. Hussey $252,398.65 (35% of $721,139.00).
*777 DOTD's liability for the damages of Kellie and Kimberly Hussey was reduced to reflect the 35% fault of DOTD in the trial court judgment, and we find no error in that reduction. However, we correct the mathematical error in the judgment amount in accordance with our appellate power to render any judgment that is just, legal, and proper upon the record as provided in LSA-C.C.P. art. 2164. The judgment is hereby amended to award Kellie and Kimberly Hussey, each, the amount of $17,500.00 (35% of $50,000.00).

Costs
On appeal, the state contends that because it was found only partially at fault, it should not have been found by the trial court to be wholly responsible for the costs incurred by the plaintiffs, while plaintiffs/appellees assert that because DOTD was the only defendant against whom this matter had to be tried, it should be responsible for the costs assessed. DOTD cites in support of its position the case of Durant v. State, Dept. of Transp. and Development, 93-1028 (La.App. 1 Cir. 4/8/94), 636 So.2d 1022, writ denied, 94-1654 (La.10/7/94), 644 So.2d 637, wherein this court found no reasonable basis for casting DOTD for 100% of the costs where the plaintiff and DOTD were each cast with 50% of the fault in causing the accident.
The assessment of costs against the state is authorized by LSA-R.S. 13:5112(A), which provides:
In any suit against the state or any department, board, commission, agency, or political subdivision thereof, the trial or appellate court, after taking into account any equitable considerations as it would under Article 1920 or Article 2164 of the Code of Civil Procedure, as applicable, may grant in favor of the successful party and against the state, department, board, commission, agency, or political subdivision against which judgment is rendered, an award of such successful party's court costs under R.S. 13:4533 and other applicable law as the court deems proper but, if awarded, shall express such costs in a dollar amount in a judgment of the trial court or decree of the appellate court.
Further, LSA-C.C.P. art. 1920 gives a trial court authority to render judgment for costs against any party "as it may consider equitable." A trial court's assessment of costs can be reversed only upon a showing of an abuse of discretion. State ex rel. Guste v. Nicholls College Foundation, 592 So.2d 419, 422 (La.App. 1 Cir. 1991), writ denied, 593 So.2d 651 (La. 1992).
In the present case, the only costs taxed against the state were "special costs," which included five expert witness fees and the cost of the deposition of Officer Ross Johnson. The state was not taxed with any other costs, such as clerk of court's costs or costs associated with service of process, etc. Under the circumstances, we are unable to say the trial court abused its discretion in the award of costs.

CONCLUSION
For the reasons assigned herein, the judgment of the trial court is affirmed in part and amended in part to assign 35% fault to DOTD as to the damages awarded to all plaintiffs. As amended, the judgment in favor of plaintiffs against the State, through the Department of Transportation and Development is affirmed. Each party is to bear its own costs of this appeal.
AFFIRMED IN PART; AMENDED IN PART; AFFIRMED AS AMENDED.
McDONALD, J., dissents and assigns reasons.
McDONALD, J., dissenting.
I agree with the majority except in regard to the finding that the differing *778 assessments of fault found by the judge and jury must be resolved. In Thornton II this court enunciated the "more reasonable measurement" standard in reconciling and resolving differences in factual findings between a judge and jury in bifurcated trials where both findings are reasonable and neither is found to be manifestly erroneous. Thornton v. Moran (La.App. 1 Cir. 5/9/77), 348 So.2d 79, 81-82, writs denied 350 So.2d 897 (La.1977) and approved in Cornish v. State Department of Transportation and Development (La.App. 1 Cir. 12/1/94), 647 So.2d 1170, 1177-1178, writs denied (La.5/5/95), 654 So.2d 324. The majority now applies this standard to the present facts, finding that the judge's assessment of fault is more reasonable than that of the jury. However, in both of these cases, as well as those cases cited in Cornish[1], the parties were the same and it was impossible to draft a judgment with the inconsistent findings.
Thornton involved a two car vehicular accident between a car driven by Thornton and one by Moran. The jury found that Thornton had the last clear chance to avoid the accident and was, therefore, at fault in causing it. The trial judge found that Moran had the last clear chance. Because each verdict involved the identical parties they are totally irreconcilable and it would be virtually impossible to confect a judgment in the case.
Cornish involved a one-vehicle accident in which Cornish's vehicle ran off the road and hit a cattle guard. Cornish sued DOTD and Ponchatoula Homestead & Savings Association. The trial judge decided the case against DOTD and a jury decided the case against Ponchatoula, the only defendants in the case. Each factfinder's allocation of fault and amount of damages differed from the other. Again, the verdicts were totally irreconcilable because they involved the same parties.
In the case before us, the parties are not the same. The jury decided the case in favor of Mrs. Russell and Mrs. Hussey and apportioned fault against Bryan Vidrine and DOTD. The trial judge found in favor of two different plaintiffs, but against these same two defendants and apportioned fault differently than the jury did. Thus, the jury and trial judge decided the case involving a different set of plaintiffs. Since the parties are not the same in each suit I find no compelling need to reconcile these verdicts. They are not irreconcilable and one judgment does not impact on nor influence the other. Just as the parties are distinct and separate, so are the verdicts.
For these reasons, I respectfully disagree with that portion of the majority opinion that reconciles the allocation of fault.
NOTES
[1] The trial court's February 13, 2003 minute entry reflects that she originally found Kellie Hussey's general damages to be $115,000.00 and Kimberly Hussey's general damages to be $95,000.00, in addition to their special damages of $22,443.95 and $17,642.74, respectively. However, a subsequent minute entry reduced the total awards for each girl to $50,000.00 "recognizing the stipulation of counsel ... that the amount presently in controversy does not exceed $50,000.00."
[2] We note that 35% of $50,000.00 is actually $17,500.00.
[3] The memorandum at issue, dated February 1, 1989, was issued by P.J. Frederick, DOTD Maintenance Engineer Administrator to "Each District Administrator," and stated as follows:

The Department is constantly the object of litigation because of low shoulders, edge rutting or drop-offs along the roadway surface.
The Maintenance Standards Manual says that non-paved shoulders should be repaired when this condition exceeds three (3) inches and interrupting regularly scheduled work is justified when this condition exceeds five (5) inches.
The courts have ruled against the Department when this condition was only one and a half inches and apparently the Parish Maintenance Superintendents do not schedule any work on a shoulder unless the conditions in the Maintenance Standards Manual are met.
It is not our intent that a one (1) or two (2) inch drop-off or edge rut remain indefinitely simply because it has not reached the magical depth of three (3) inches. Any low shoulder, drop-off, or edge rut should be repaired in the course of routine maintenance and should this condition even approach the three (3) inch depth, it should be repaired on a priority basis. When this condition approaches the five (5) inch depth, it should be repaired immediately, not wait until the next day but work people on overtime if necessary.
We realize you are short[-]handed, but these shoulder conditions must receive attention in order to reduce the state's liability and your maintenance personnel should be advised of the above guidelines.
Mr. Dempsey D. White, Chief Engineer, has expressed an interest in experimenting in locations with a recurring low shoulder problem. Similar to the widening on the inside of curves, the idea is to use asphalt to widen 18 inches to 2 feet and about 6 inches deep on a fairly steep slope then pull shoulder material back over this. Anyone having a location they want to try this in should advise this office.
[4] When testifying with reference to Exhibit J-6B, Melanie Williams stated that the lady appearing in the orange vest was positioned at the point where Bryan's car first left the road, and that the second lady was positioned at the second point it dropped off. Melanie stated that the accident reconstructionist marked with paint on the road an "X" and an arrow at the point the vehicle first left the road; the second point was marked with either a "Y" or a "T" and an arrow; both as depicted in Exhibit J-6B. She further described the shoulder in that area as choppy, crumbled, and very rough.
[5] We must note that Cornish has been abrogated in part by the supreme court, though not as to its succinct interpretation of Thornton II, as it applies to the instant case. In Clement v. Frey, 95-1119 (La.1/16/96), 666 So.2d 607, the supreme court found the Cornish panel had erred when, after finding the trial court had committed manifest error in the apportionment of fault, it conducted a de novo review on the issue. Rather, the supreme court in Clement instructed appellate courts that the appropriate approach, after finding manifest error in apportionment of fault, is to apply the Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976) approach used with respect to an erroneous damages award; i.e., "it should adjust the award, but only to the extent of lowering or raising it to the highest or lowest point respectively which is reasonably within the trial court's discretion." Clement v. Frey, 666 So.2d at 610-11. Clement did not speak to the Thornton II scenario: an appellate court finds differing assessments of fault by a judge and jury following a bifurcated trial; both have a reasonable basis in the record and therefore neither is manifestly erroneous. In Clement the manifestly erroneous apportionment of fault occurred in a bench trial. And while Cornish dealt with a bifurcated trial resulting in differing assessments of fault by the judge and jury, the appellate court determined that both the trial judge and the jury manifestly erred in assessing a low percentage of fault to the plaintiff. In contrast, in both Thornton II and the instant case, the differing assessments of fault by the judge and jury were found to have a reasonable basis in the record and therefore were not manifestly erroneous; however because such findings are inconsistent, we are directed by the jurisprudence to modify the allocations of fault to the more reasonable of the two findings.
[1] See: Richard v. Teague, 92-17 (La.App. 3rd Cir.5/4/94), 636 So.2d 1160, 1168; Carr v. City of New Orleans, 626 So.2d 374, 376 (La. App. 4th Cir.1993), writ denied, 634 So.2d 398 (La.1994); Haydel v. Commercial Union Insurance Company, 617 So.2d 137, 139 (La. App. 5th Cir.), writ denied, 619 So.2d 551 (La.1993); McCullough v. Regional Transit Authority, 593 So.2d 731, 734 (La.App. 4th Cir.), writ denied, 595 So.2d 655 (La.1992); Felice v. Valleylab, Inc., 520 So.2d 920, 924 (La.App. 3rd Cir.1987), writs denied, 522 So.2d 562, 563 (La.1988); Thornton v. Moran, 348 So.2d 79, 81-82 (La.App. 1st Cir.), writs denied, 350 So.2d 897, 898, 900 (La.1977).