856 So.2d 64 (2003)
James Michael HAYS and Belinda Hays, Plaintiffs-Appellants,
v.
STATE of Louisiana, et al., Defendants-Appellants.
No. 37,229-CA.
Court of Appeal of Louisiana, Second Circuit.
September 24, 2003.
Rehearing Denied October 23, 2003.
*67 Kitchens, Benton, Kitchens & Newell, by Daniel W. Newell and Paul Kitchens, for Plaintiffs-Appellants, James Michael Hays and Belinda Hays.
Stamey & Miller by Joseph B. Stamey and David A. Peterson, for Defendant-Appellant, State of La. Through The Board of Supervisors of The University of Louisiana System on Behalf of Grambling State University.
Hudson, Potts & Bernstein, by Jay P. Adams, for Defendant-Appellee, Town of Grambling.
Gold, Weems, Bruser, Sues & Rundell, by Edward E. Rundell, for Third Party Defendant Meyer, Meyer, Lacroix and Hixson, Inc.
Before GASKINS, PEATROSS and MOORE, JJ.
GASKINS, J.
This appeal arises from the alleged discharge of untreated or improperly treated sewage into a stream that crosses the plaintiffs' property. Trial was bifurcated such that the trial judge determined the liability of and damages assessed against the Town of Grambling ("the Town"), while a jury determined liability and damages as to the other parties. As a result of this bifurcation, the jury awarded a total of $145,000 in property damages and assessed 44 percent fault against Grambling State University (GSU), resulting in a judgment of $63,800 against that entity. The trial judge agreed with the jury's allocation of fault, but found that the contamination warranted only general damages of $10,000, thus resulting in an award of $5,600 against the Town for its 56 percent of fault.
GSU appeals from the trial court judgment on the merits, as well as a separate judgment assessing it with $36,515.72 of the plaintiffs' expert witness fees. The plaintiffs appeal from the portion of the judgment on the merits which assessed only $5,600 in general damages against the Town.
For the reasons set forth below, we amend the judgment on the merits to reduce the award of damages against GSU from $63,800 to $4,400; in all other respects, that judgment is affirmed. We also amend the judgment on the plaintiffs' *68 motion to reduce the costs assessed against GSU to $16,506.92 and to raise the costs assessed against the Town from $1,000 to $21,008.80.

FACTS
The Hays family owns 70 acres of pastureland in Lincoln Parish which is south of the Town and GSU. A stream known as the Red-Wine Creek originates in the Town just north of GSU and then flows south through the Town and GSU onto the Hays property. The Hays family contends that the Town and GSU discharged polluted water from their water treatment facilities or sewer lines into the Red-Wine Creek. Another unnamed creek flows east through the Hays property and merges with Red-Wine Creek; this unnamed creek does not receive any of the polluted water.
A prior suit concerning the alleged pollution of this tract of land was brought by members of the Hays family. (Although the current owner, James Michael Hays, was not a party to that suit, his parents were.) This suit was settled on August 25, 1994.
While this suit was pending, James Michael Hays purchased the property in question from his parents in 1993 for $175,000. In 1995, Mr. Hays undertook a remediation project to clean up the property around Red-Wine Creek. The bottom of the creek and the banks were dug up and the sludge was spread out on the pastureland to dry out. The creek was then straightened. However, over time the creek began to meander again. Mr. Hays estimated that this remediation, which was performed by employees working for his company, cost about $55,000.
The Town and GSU formerly had separate sewage treatment facilities, each operating oxidation ponds which discharged their treated water into Red-Wine Creek. In the early 1990's, they reached an agreement to jointly build a $2.4 million state-of-the-art sewage treatment plant. The plant was to be operated by the Town while GSU paid an annual user fee. The plant went on line in July 1995, and GSU switched over to the new facility in December 1995.
On August 23, 1995, about a month after the new plant began operating, Hays and his wife, Belinda Hays, filed suit against GSU and the Town, alleging that untreated or improperly treated sewage was being discharged into Red-Wine Creek either from the treatment facilities of the defendants or directly from sewer lines. They asserted that, while they initially believed that the settlement in the prior suit had rectified the situation, they later learned that the pollution was continuing. In June 1996, the Louisiana Department of Environmental Quality (DEQ) was added as a defendant; however, it was released from the suit by a joint motion of dismissal in January 2001.
The Town filed a third-party demand against Meyer, Meyer, Lacroix and Hixson, Inc. ("MMLH"), and McInnis Brothers Construction, Inc. ("McInnis"). It contended that it had relied upon them in the design, construction, start-up procedures, and maintenance of its waste water treatment plant. Although McInnis was later dismissed from the suit, MMLH, the consulting engineering firm that designed the new sewage treatment plant, remained as a third-party defendant.
In response to exceptions of res judicata, the trial court ruled that the plaintiffs could only litigate claims arising from tortious conduct occurring after August 25, 1994, the date when the prior lawsuit was settled.
In July 2001, GSU filed a motion in limine to restrict and/or strike the testimony *69 of two of the plaintiffs' witnesses. It alleged that under the Daubert criteria, the testimony of Dr. James Smith and Pat Eddings should be prohibited or restricted. The motion was denied.
A bifurcated trial was held from July 30 to August 6, 2001. A jury heard the claims against GSU and MMLH. However, pursuant to La. R.S. 13:5105, the trial judge heard the claims pertaining to the Town. (The jury was apparently unaware of this bifurcation.)
The plaintiffs presented evidence of high levels of fecal coliform in the Red-Wine Creek, as well as findings of elevated levels of arsenic and selenium on their property. According to expert testimony, fecal coliform is a bacteria contained in untreated or partially treated human waste or sewage. Arsenic and selenium are heavy metals which can occur naturally; however, if present in high enough levels, they can be hazardous to organic life and human beings. According to the plaintiffs' expert, Dr. Smith, remediation of the area around the creek to remove the selenium contamination would cost about $400,000. (He conceded that the arsenic levels were insufficient to require remedy.) Testimony was given about the noxious odors emanating from the stream due to the polluted water and the occasional presence of "sewage artifacts," a term referring to such flushable items as toilet paper, condoms and tampons. On the other hand, the defendants presented evidence that the selenium levels on the property were not sufficiently elevated to pose a hazard. GSU's expert, Dr. Pressley L. Campbell, testified that no remediation was necessary. However, if it were, Dr. Campbell opined that it could be accomplished for $90,000.
The jury found that both GSU and the Town were "at fault, as to acts or omissions occurring after August 25, 1994 with regard to the environmental condition" of the plaintiffs' property and that the fault of each was a legal cause of damages to the plaintiffs. It also found no fault as to the plaintiffs. GSU was assessed with 44 percent of the fault and the Town with 56 percent. However, no fault was assessed against MMLH. The jury awarded property damages of $145,000 but no general damages.[1]
The trial court issued a written opinion in which it made numerous findings of fact. It found that after August 25, 1994, the Town deposited partially or improperly treated sewage in Red-Wine Creek which caused the fecal coliform levels in the creek to exceed DEQ limits. However, these levels decomposed in hours and caused no permanent environmental damage. Sewage artifacts were deposited along the creek by the defendants. Occasionally there were fish kills and noxious odors. As a result, the Hays property near the creek was unsuitable for any recreational purpose.
The trial court found that the Town breached its duty to the plaintiffs by releasing partially or improperly treated sewage with elevated levels of fecal coliform, sewage artifacts and pungent odors on the Hays property. However, the court found that the evidence did not demonstrate that the selenium found on the Hays property was attributable to any action by the Town since August 25, 1994. Thus, it awarded $10,000 in general damages for mental anguish, embarrassment and loss of use of the property during periods of discharge of improperly treated sewage.
*70 Agreeing with the jury's allocation of fault, the trial court cast the Town for 56 percent of the $10,000 award.
Judgment was signed on March 20, 2002. GSU was cast in judgment for $63,800 (or 44 percent of the $145,000 awarded by the jury). The Town was cast for $5,600 (or 56 percent of the $10,000 awarded by the trial judge). Costs were assessed against the defendants according to their percentages of fault.
GSU filed a motion for JNOV, contending that the evidence was overwhelmingly in its favor as to quantum and the issue of whether selenium was present. The motion was denied.
The plaintiffs filed a motion to fix costs. They requested that the defendants be required to pay their expert witness fees and costs. These included $14,493.75 for Larry Lott, Jr. and Mid-South Analytical Labs, Inc.; $19,021.97 for Dr. James Smith and Mid-South Environmental Services, Inc.; and $4,000 for Robin Beck and the Appraisal Group. Both the Town and GSU opposed the motion to fix costs. The trial court taxed the entirety of the expert fees as costs in the amount of $37,515.72; it found that none of the costs of the expert witnesses should be borne by the plaintiffs. Since the Town prevailed on the major issue of whether the plaintiffs' property sustained metal contamination, the court assessed to it only the portion of the expert fees relating to the presence of fecal coliform, or $1,000. The balance of the fees, or $36,515.72, was assessed against GSU.
The plaintiffs appealed from the judgment against the Town. GSU appealed from both the judgment on the merits and the judgment on the motion to fix costs.

STANDARD OF REVIEW
The initial inquiry we must resolve is the standard of review to be applied in this bifurcated case with inconsistent results.
In Thornton v. Moran, 341 So.2d 1136 (La.App. 1st Cir.1976), the appellate court reviewed contradictory judgments rendered in a bifurcated trial under the manifest error standard and affirmed. The Louisiana Supreme Court peremptorily granted writs, holding that in such a bifurcated case, an intermediate appellate court was required to resolve the differences in the factual findings between the jury and the judge and render a single opinion based upon the record. See Thornton v. Moran, 343 So.2d 1065 (La.1977).
Since Thornton, supra, the various appellate courts have taken different approaches to accomplishing the supreme court's mandate to reconcile conflicting decisions in bifurcated trials.[2]
The Town argues that there was no conflict between the findings of the jury and the judge in the instant case because, as a matter of law, the jury had no right to adjudicate the fault of the public defendant, and thus there was no need to harmonize the conflicted findings. Lasswell v. Matlack, Inc., 527 So.2d 1199 (La.App. 3d Cir.1988), writs denied, 532 So.2d 104, 105 (La.1988); Ourso v. Grimm, 92-1274 (La. App. 3d Cir.1/5/94), 630 So.2d 963, writs denied, 94-0346 (La.3/25/94), 635 So.2d 230, and 94-0339 (La.3/25/94), 635 So.2d 231. The Town asserts that the correct standard of review is manifest error.
Both the plaintiffs and GSU suggest that the methodology set forth in Eppinette v. City of Monroe, 29,366 (La.App.2d Cir.6/20/97), 698 So.2d 658, is the appropriate *71 way to harmonize the inconsistent findings. There we adopted the procedure utilized by the First Circuit on remand in Thornton v. Moran, 348 So.2d 79 (La.App. 1st Cir.5/9/77), writs denied, 350 So.2d 897(La.1977), 350 So.2d 898 (La.1977), 350 So.2d 900 (La.1977). In Eppinette, 698 So.2d at 665, we stated:
In Thornton v. Moran, supra, the court held that an intermediate appellate court, in bifurcated cases, is required to reconcile or resolve any differences in the factual findings between the trial judge and the jury by determining which witnesses are more credible, to ascertain which of the triers of fact accorded a more reasonable measurement to the evidence in reaching a decision, and to decide which of the said triers of fact gave a more reasonable evaluation and drew a more reasonable inference from the facts, in order to harmonize the judgments. Said another way, after concluding that a conflict exists, there must then be a determination that the findings of fault and apportionment and the award of damages were reasonable and not manifestly erroneous. In the event that the finding by one fact finder is manifestly erroneous and the other is not, then the manifestly erroneous determination is discarded and the finding which is not manifestly erroneous will stand.
Finally, if conflicting findings are not manifestly erroneous, then the court must, after a careful review of the entire record, examine each inconsistent reasonable finding to determine which fact finder's finding is more reasonable. Thornton v. Moran, supra.

We agree with the appellants. We will apply the standard of review set forth in the Eppinette case, and determine whether the findings are manifestly erroneous and, if both are not manifestly erroneous, which is more reasonable.

DAMAGES
We note at the outset that the parties do not argue about the percentages of fault assigned in this case. The jury assessed 44 percent fault to GSU and 56 percent to the Town; in his opinion, the trial judge adopted these percentages. Given the superior ability of the Town to regulate the sewage through its control of the sewage treatment plant after it opened in 1995, such an allocation was not clearly wrong.
On the issue of damages, the plaintiffs assert that, as to the Town, the trial court erred in awarding them no property damages and only $10,000 in general damages. GSU contends that the jury erred in awarding excessive damages of $145,000 in property damages.
Although the jury and the judge each concluded that both the Town and GSU bore fault for the "environmental condition" of the plaintiffs' property, it is apparent that they reached these conclusions under different theories. The judge states in his written opinion that he did not find that the plaintiffs had carried their burden of proof as to selenium contamination and awarded damages on the basis of the unpleasant consequences of the elevated fecal coliform levels and the presence of sewage artifacts. However, from the amount of the damages it awarded, it is clear that the jury found more than just problems related to fecal coliform. The jury apparently found some degree of selenium contamination as the amount awarded was the equivalent of the cost of the 1995 remediation and the projected cost of remediation given by Dr. Campbell, GSU's expert.[3]
*72 Consequently, we find that a conflict exists as per Eppinette, supra.
In order to recover for selenium contamination, the plaintiffs must prove that there was a causal connection between the presence of selenium on their property and the defendants' facilities and that the contamination occurred after August 25, 1994, the settlement date of the prior suit. After a close review of the record, we find that the jury's determinations on these issues were manifestly erroneous.
In the early 1990's, water entering and leaving the Town's old oxidation pond was tested for selenium; the levels were "below detection limits." There was no testing for selenium at GSU's old oxidation pond. Dr. Smith indicated that metals are usually heavier than water and normally metals and sludge end up on the bottom of a treatment or oxidation pond. According to John William Moore, a registered professional environmental engineer who was a partner at MMLH, the sludge was on the bottom of the oxidation pond and would have to be pushed out of the pond by some mechanical means. As to the new treatment plant, Dr. Smith testified that most of the metalslike seleniumshould end up in the sewage blanket which would be in the sludge. Mr. Moore testified that the sludge ends up in drying beds; after drying, it is disposed of in a landfill. However, there is no indication that the sludge at the new plant was tested for selenium.
Although selenium was found at various points on the Hays property in the vicinity of Red Wine Creek, the amounts were well below the standard requiring cleanup under the Risk Evaluation and Correction Action Program (RECAP) promulgated by DEQ.
Additionally, even if the evidence presented by the plaintiffs showed that the selenium was deposited on the plaintiffs' land as a result of the defendants' fault, it does not demonstrate that these actions occurred after the settlement of the prior suit in August 1994. No tests were conducted after the 1995 cleanup to verify that all selenium (assuming there was any on the property at that time) had been removed. We have only Dr. Smith's testimony that if the cleanup involved the removal of three to four feet of the creek bottom, the contaminants should have been removed. According to Mr. Hays, during the cleanup the soil removed from the bottom and banks of the creek was spread out on the property to dry out and the creek itself was straightened. However, the record suggests that the creek later reverted to its former meandering path; there is no way of knowing with any degree of certainty whether the selenium found on the property was newly deposited or if the creek merely wandered back across the areas where soil contaminated prior to August 25, 1994, was spread during the 1995 remediation.
Since no tests were performed near the time of the August 1994 settlement or the 1995 cleanup, there is no support for the plaintiffs' contention that the selenium levels on the property were rising and would soon reach a hazardous level. While the plaintiffs conducted testing for heavy metals like selenium on their property in 2000 and 2001, they failed to retest any of the sites with elevated readings to document that there was an increase from one testing period to another.
Having found that the jury's findings were manifestly erroneous, we now examine the judge's findings of fact. The record supports the judge's conclusion that the selenium was either naturally occurring or caused by an unknown phenomenon unrelated to the defendants. Strong support for this position is found in the fact that the unnamed stream on the Hays *73 property was not in a position to receive drainage from the defendants, yet it had the second highest reading for selenium on the total metals test.
The trial court has much discretion in awarding damages in tort cases. La. C.C. art. 2324.1. Because of this vast discretion granted the trial court, an appellate court should rarely disturb an award of general damages. Only when the record clearly shows that the trial court abused its discretion in awarding damages in either direction beyond that which a reasonable trier of fact would assess for the effects of a particular injury on a particular party under the particular circumstances should an appellate court either increase or decrease the award. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994); Morris v. Flores, 36,932 (La. App.2d Cir.3/7/03), 840 So.2d 1257.
As to the trial judge's finding that the Hays property sustained no selenium contamination attributable to the defendants, we find no manifest error. Accordingly, the trial judge's decision to not award property damages in favor of the plaintiffs was correct.
The evidence in this record reveals that since August 1994, untreated or improperly treated sewage occasionally made its way from the defendants' facilities to the Red-Wine Creek. As a result, the plaintiffs endured foul odors and the unpleasant presence of sewage artifacts on their property. Therefore, the trial judge was not manifestly erroneous in awarding general damages to the plaintiffs for their resulting inconvenience.
As to the amount of $10,000 in general damages awarded by the judge, we are unable to find that this amount is abusively low. While the odors and the sewage artifacts found on the Hays property were unquestionably distressing to the plaintiffs, the evidence demonstrated that the fecal coliform levels quickly dissipated.
Based on the foregoing, we find that the jury's award of $145,000 in property damages and no general damages is manifestly erroneous. The trial judge's award of $10,000 in general damages and no property damages is supported by the record and is not manifestly erroneous. Therefore, pursuant to Eppinette, supra, we discard the jury's manifestly erroneous determination and affirm the trial judge's award. Applying the percentages of fault found by both the jury and the judge, general damages of $4,400 are assessed against GSU and $5,600 against the Town.

JNOV
GSU contends that the trial court erred in denying its motion for JNOV where the jury's verdict and the judge's ruling in this bifurcated trial were inconsistent as to the alleged environmental contamination.[4]
A motion for a JNOV may be granted only if the facts and inferences point so strongly and overwhelmingly in favor of one party that reasonable jurors could not arrive at a contrary verdict. Powell v. Regional Transit Authority, 96-0715 (La.6/18/97), 695 So.2d 1326. If the opposing evidence is of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions, the motion for JNOV should be denied. Powell, supra; Kennedy v. Thomas, 34,530 (La.App.2d Cir.4/4/01), 784 So.2d 692.
*74 In Davis v. Witt, XXXX-XXXX (La.7/2/03), 851 So.2d 1119, the Louisiana Supreme court stated that JNOV was not a procedural tool to reconcile conflicting decisions where reasonable minds could differ with respect to the evidence.
In denying the motion for JNOV, the court stated that it could not conclude that, in view of the expert testimony, the instant case was such that a reasonable mind could not have concluded as the jury did. Therefore, as stated in the Davis case, JNOV was not the appropriate method to reconcile the inconsistent findings in this bifurcated trial.

DAUBERT MOTION
GSU also argues that the trial court erred in denying its Daubert motion to restrict or exclude the testimony of the plaintiffs' experts. It contends that opinions of the plaintiffs' expert in environmental science and hazardous waste treatment, Dr. James Smith, were based on scientific reasoning which did not meet the standards of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and State v. Foret, 628 So.2d 1116 (La.1993).
La. C.E. art. 702 states:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
Comment (d) to La. C.E. art. 702 states that the trial judge should have "[b]road discretion ... accorded ... in his determination as to whether expert testimony should be held admissible and who should or should not be permitted to testify as an expert."
Louisiana has adopted the United States Supreme Court's interpretation of Federal Rule of Evidence 702, which mirrors La. C.E. art. 702. Foret, supra. Daubert calls upon trial courts to perform a gatekeeping function by deciding whether the expert scientific evidence or testimony is both reliable and relevant. Daubert, 509 U.S. at 589, 113 S.Ct. at 2795; Cleland v. City of Lake Charles, 2002-805 (La.App. 3d Cir.3/5/03), 840 So.2d 686.
The trial court in fulfilling its gatekeeping function with respect to admitting expert testimony should consider the following non-exclusive factors: (1) whether the theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the methodology is generally accepted by the relevant scientific community. Daubert, 509 U.S. at 593-94, 113 S.Ct. at 2796-2797.
At the hearing on its motion in limine, GSU presented the testimony of its expert, Dr. Campbell. He testified that the toxicity characteristic leaching procedure (TCLP) utilized by the plaintiffs' expert, Dr. Smith, had not gained any general acceptance in the scientific community as a proper method by which to determine the source of selenium. However, he admitted that the tests run by the plaintiffs were proper and valid tests. He only disputed Dr. Smith's use and interpretation of the TCLP, i.e., the conclusions Dr. Smith drew from them about the source of the arsenic and the selenium. However, Dr. Smith testified at the hearing that he was not trying to find the source of the selenium with this test. The trial court found that the objection about Dr. Smith's use and interpretation of the TCLP results went to the weight of the testimony rather *75 than to its admissibility and it denied the motion in limine.
GSU's objection to Dr. Smith's testimony was limited in scope to his use and interpretation of TCLP. GSU's own expert admitted that the test was valid. We find no error in the trial court's denial of the Daubert motion.

JURY INSTRUCTIONS
GSU complains of the trial court's failure to give a requested jury instruction which would have directed the jury that no award be made exceeding the value of the property. An appraiser presented by GSU testified that the property was worth only $105,000. However, the plaintiffs' appraiser valued it at $168,000.
Adequate jury instructions provide the correct principles of law for the jury to apply to those issues reasonably raised by the pleadings and evidence. The trial court has great discretion in composing jury instructions and is not required to give the exact instructions submitted by a litigant. Posey v. Singletary, 34,913 (La.App.2d Cir.9/28/01), 795 So.2d 1249. Trial courts are given broad discretion in formulating jury instructions, and it is well accepted that a trial court judgment will not be reversed so long as the charge correctly states the substance of the law. Nicholas v. Allstate Ins. Co., 1999-2522 (La.8/31/00), 765 So.2d 1017.
As a general rule of thumb, when a person sustains property damage due to the fault of another, he is entitled to recover damages including the cost of restoration that has been or may be reasonably incurred, or, at his election, the difference between the value of the property before and after the harm. If, however, the cost of restoring the property in its original condition is disproportionate to the value of the property or economically wasteful, unless there is a reason personal to the owner for restoring the original condition or there is a reason to believe that the plaintiff will, in fact, make the repairs, damages are measured only by the difference between the value of the property before and after the harm. Roman Catholic Church of Archdiocese of New Orleans v. Louisiana Gas Service Co., 618 So.2d 874 (La.1993). In the instant case, the instruction given on property damage and value was a verbatim recitation of this language from Roman Catholic Church of Archdiocese of New Orleans, supra.
The jury instructions here were adequate and correctly reflected the law as set forth in Roman Catholic Church of Archdiocese of New Orleans, supra. We find no error.

MOTION TO FIX COSTS
As to the award of expert fees as costs, GSU claims that the trial court abused its discretion in taxing the full amount of expert fees as costs. It argues that a large portion of the fees was not allowable under La. R.S. 13:3666.
Witnesses called to testify as expert witnesses shall be compensated for their services, with the amount to be determined by the court and taxed as costs to be paid by the party cast in judgment. La. R.S. 13:3666; Mount Mariah Baptist Church, Inc. v. Pannell's Associated Electric, Inc., 36,361 (La.App.2d Cir.12/20/02), 835 So.2d 880, writ denied, XXXX-XXXX (La.5/2/03), 842 So.2d 1101. An expert witness is entitled to reasonable compensation for his court appearance and for his preparatory work. Orea v. Scallan, 32,622 (La.App.2d Cir.1/26/00), 750 So.2d 483. The trial judge has great discretion in awarding and fixing costs and expert fees. A trial court's assessment of costs can be reversed by an appellate court only upon a showing of abuse of discretion. Mount *76 Mariah Baptist Church, Inc., supra; Orea, supra.
Factors to be considered by the trial judge in setting an expert witness fee include time spent testifying, time spent in preparatory work for trial, time spent away from regular duties while waiting to testify, the extent and nature of the work performed, and the knowledge, attainments and skill of the expert. Additional considerations include the helpfulness of the expert's report and testimony to the court, the amount in controversy, the complexity of the problem addressed by the expert and awards to experts in similar cases. Mount Mariah Baptist Church, Inc., supra.
In taxing all of the plaintiffs' invoices as costs, the trial court considered "the time spent while testifying, time spent in preparation for trial, the extent and nature of the work involved, the knowledge and attainment of the experts, the amount in controversy and the complexity of the issues addressed." The court specifically found that the testimony presented by the plaintiffs' experts aided the triers of fact and "was essential to an adequate understanding of the factual issues presented." Furthermore, the court concluded "[a]fter much thought and deliberation" that the plaintiffs should not bear any of the expert costs.
We find no abuse of the trial court's discretion in its decision to assess all of the plaintiffs' invoices as costs. The judge, who sat as one of the two triers of fact in this complex case, specifically found that the testimony of the plaintiffs' experts was highly beneficial. A review of the invoices does not indicate that either the fees charged or the amount of testing performed in preparation for trial was excessive.
However, we hold that the expert witness fees assessed as costs under La. R.S. 13:3666 should have been awarded against the defendants according to their percentages of fault. An appellate court may "render any judgment which is just, legal, and proper upon the record on appeal," and tax costs as it considers equitable. La. C.C.P. art. 2164. In light of our amendment of damages, we find that it is not equitable to require GSUwhich was only 44 percent at faultto bear responsibility for $36,515.72 of the expert fees cast as costs while the Townwhich bore 56 percent faultto pay only $1,000. Therefore, we direct that GSU be ordered to pay $16,506.92 and the Town $21,008.80 of the $37,515.72 awarded pursuant to the motion to fix costs.

CONCLUSION
The judgment of the trial court is amended to reduce the award of damages against GSU to $4,400. In all other respects, the judgment is affirmed.
The judgment on the rule to tax costs is amended to assess $16,506.92 against GSU and $21,008.80 against the Town.
Costs of this appeal are assessed equally between the Hays, GSU and the Town of Grambling.
AMENDED AND AS AMENDED AFFIRMED.

APPLICATION FOR REHEARING
Before WILLIAMS, GASKINS, PEATROSS, DREW, and MOORE, JJ.
Rehearing denied.
NOTES
[1] The parties speculate that the amount of property damages was derived from the $55,000 cost of the 1995 remediation by Mr. Hays and the $90,000 estimate given for future selenium remediation by GSU's expert, Dr. Campbell.
[2] The Louisiana Supreme Court has acknowledged the conflict between the circuits in several opinions but has declined to address the issue. See Powell v. Regional Transit Authority, infra, and Davis v. Witt, infra.
[3] We note with interest that the amount awarded by the jury does not approach the figure of $400,000 suggested by the plaintiffs' expert for extensive selenium remediation.
[4] Although the motion for JNOV also mentioned new trial or remittitur in the alternative, counsel for GSU conceded at the hearing on the motion that "the real focus is simply the JNOV." Thus, in this assignment we address only the motion for JNOV.