STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

05-471

JOHN AND KLEA HEBERT

VERSUS

RAPIDES PARISH POLICE JURY, ET AL.

**********

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 184,823
HONORABLE GEORGE C. METOYER, JR., JUDGE

**********

ULYSSES GENE THIBODEAUX
CHIEF JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Glenn B. Gremillion,
Elizabeth A. Pickett, Billy Howard Ezell, and J. David Painter, Judges.

GREMILLION, J., CONCURS AND ASSIGNS REASONS.

PICKETT, J., CONCURS IN THE RESULT FOR THE REASONS ASSIGNED
BY JUDGE GREMILLION.

PAINTER, J., DISSENTS AND ASSIGNS WRITTEN REASONS.

AMENDED AND, AS AMENDED,
AFFIRMED.

Ronald J. Fiorenza
John D. Ryland
P. O. Drawer 1791
Alexandria, LA 71309-1791
Telephone: (318) 445-3631
COUNSEL FOR:
    Defendant/Appellant - State of Louisiana, Department of
    Transportation and Development

Roy S. Halcomb, Jr.
P. O. Box 1311
Alexandria, LA 71301
Telephone: (318) 487-4589
COUNSEL FOR:
     Plaintiffs/Appellees - John and Klea Hebert

Robert L. Bussey
Assistant District Attorney - Parish of Rapides
P. O. Box 307
Alexandria, LA 71309
Telephone: (318) 449-1937
COUNSEL FOR:
     Defendant/Appellee - Rapides Parish Police Jury

THIBODEAUX, Chief Judge.

Plaintiffs, John and Klea Hebert (the Heberts), the parents of a teenager killed in a one-car accident, brought a wrongful death and survival action against the Rapides Parish Police Jury (RPPJ) and the State of Louisiana, through the Department of Transportation and Development (DOTD). The RPPJ requested a bench trial; therefore, the trial was bifurcated and the DOTD's fault was tried to a jury. The jury found that the DOTD and the RPPJ were both 50 percent at fault; however, the trial judge assessed no fault to the DOTD, attributed 60 percent of the fault to the deceased driver, and assessed the remaining 40 percent of fault to the RPPJ. The DOTD and the plaintiffs have appealed. We have undertaken a de novo review of the record in order to harmonize the verdicts. For the reasons set forth, the judgment of the trial court is amended and, as amended, is affirmed.

I.

**ISSUES**

*The DOTD's Issues*

1. Did the trial judge err in admitting into evidence the DOTD inspection reports of the Haines Creek Bridge?

2. Did the trial judge err in failing to include on the verdict form the contractor/construction company that built the Haines Creek Bridge?

3. Did the trial judge err in finding that the DOTD was legally liable for the condition of the Haines Creek Bridge?

4. Did the trial judge err in the methodology used to incorporate its verdict and that of the jury into a single judgment?

5.  Should the judgment be amended to reflect survival damages in the amount of $34,435.62 rather than $24,453.63?

II.

## FACTUAL BACKGROUND

Katie Hebert, the seventeen-year-old daughter of the plaintiffs, was killed in a one-car accident at approximately 9:00 p.m. on October 15, 1995. She was alone and driving east on Philadelphia Road in Rapides Parish. It is believed that as she entered a deep curve that approaches the Haines Creek Bridge, the right wheels of the vehicle she was driving left the roadway. There was a six-inch to eight-inch drop-off to the shoulder. Upon re-entering the roadway, she apparently lost control of the vehicle and collided with the Haines Creek Bridge railing. The bridge railing was constructed of three-inch pipes that were not bordered by guardrails. One of the pipes pierced Katie's door, killing her. Prior to the accident, there were no curve warning signs or reduction in speed signs posted in advance of the curve.

Philadelphia Road and the Haines Creek Bridge are part of an "off-system" roadway, owned and maintained by the RPPJ. The bridge was constructed in 1980. Shortly after the construction of the bridge, the DOTD began to perform bridge inspections every two years. In each of its inspection reports, it advised the RPPJ that the bridge was in substandard condition. Prior to Katie's accident, neither the DOTD nor the RPPJ took any action to remediate those conditions.

The plaintiffs sued for damages the RPPJ, the DOTD, and the contractor that built the bridge, Slocum Construction and/or Slocum Manufacturing (Slocum). Slocum was dismissed from the suit pursuant to La.R.S. 9:2772, because the suit was filed against it more than five years after the peremptive period allowed for doing so.

The suit proceeded against the remaining defendants. The Heberts asserted that the absence of guardrails from the bridge was the primary cause of Katie's death and that both defendants were responsible for this condition. The RPPJ and the DOTD both alleged that Katie's excessive speed upon entering the curve was the cause of her injuries.

The RPPJ requested a bench trial. The case against the DOTD was tried to a jury. The judge completed the same jury verdict form that was completed by the jury. He found that the RPPJ was 40 percent at fault and that Katie was 60 percent at fault. He did not assess any liability to the DOTD. The jury, on the other hand, found the RPPJ and the DOTD to be equally at fault and assessed each of them with 50 percent liability for the accident. It assessed no fault to Katie. The jury's verdict form reflected an award for general damages to the Heberts in the amount of $750,000.00 each, a joint award of survival damages for Katie's pre-death pain and suffering in the amount of $25,000.00, special damages to the plaintiffs in the amount of $43,871.24, for a total damage award of $1,568,871.24. The trial judge's verdict form reflected an award of $500,000.00 to Mrs. Hebert in general damages, $700,000.00 in general damages to Mr. Hebert, total survival damages in the amount of $100,000.00, and special damages totaling, $80,066.00.

The trial judge rendered a single judgment. In accordance with the separate verdicts rendered by the court and the jury, the DOTD was to pay the Heberts $375,000.00 each in general damages and $24,435.63 jointly, with legal interest on all amounts awarded from the date of judicial demand until paid. The RPPJ was ordered to pay Mrs. Hebert, $200,000.00, to pay Mr. Hebert, $280,000.00, and to pay them, jointly, special damages in the amount of $53,591.50, with legal

3

interest on all amounts awarded from the date of judicial demand until paid. All court costs were assessed equally to the DOTD and the RPPJ.

The DOTD suspensively appealed the judgment, and the Heberts answered the appeal. The RPPJ has not appealed.

III.

**LAW AND DISCUSSION**

***Admissibility of the Bridge Inspection Reports***

The admissibility of the bridge inspection reports prepared by the DOTD was initially the subject of a Motion to Strike filed by the DOTD in the trial court. The DOTD argued that the reports were inadmissible pursuant to 23 U.S.C. § 409.[1] The Heberts argued they were admissible because they were not being compiled for purposes contemplated in the statute. The trial court denied the DOTD's motion on November 24, 2003, and accepted the reports into evidence. The DOTD filed writs with this court and the supreme court, both of which were denied.[2] As the trial date approached, the DOTD filed a Motion for Protective Order, again seeking to exclude from evidence the bridge inspection reports. The trial court denied the motion on September 20, 2004, and again ruled that 23 U.S.C. § 409 did not apply to the bridge

_____

[1]23 U.S.C. § 409 states:

> Notwithstanding any other provision of law, reports, surveys, schedules, lists, or data compiled or collected for the purpose of identifying, evaluating, or planning the safety enhancement of potential accident sites, hazardous roadway conditions, or railway-highway crossings, pursuant to sections 130, 144, and 148 of this title or for the purpose of developing any highway safety construction improvement project which may be implemented utilizing Federal-aid highway funds shall not be subject to discovery or admitted into evidence in a Federal or State court proceeding or considered for other purposes in any action for damages arising from any occurrence at a location mentioned or addressed in such reports, surveys, schedules, lists, or data.

[2]Court of Appeal Docket No. CW-03-1759; La. Supreme Court Docket No. 04-CC-0749.

4

inspection reports, because the reports had been compiled and collected for purposes unrelated to the statute. Writs were applied for with this court and the supreme court and both were denied.[3] The DOTD, now on appeal, asks this court to again review the propriety of the admissibility of these reports into evidence during the trial.

This court's denials of both supervisory writs, in which we expressly stated our findings of no error in the trial court's rulings, constitute the law of the case. The law of the case doctrine applies to prior rulings of appellate courts and, generally, provides that an appeal court will not reconsider its own rulings of law in the same case. *Gentry v. Biddle*, 05-61 (La.App. 3 Cir. 11/2/05), 916 So.2d 347. The application of this doctrine is discretionary and may be inapplicable in cases in which the prior decision "was palpably erroneous or its application would result in manifest injustice." *Id*. at 352 (quoting *Griggs v. Riverland Med. Ctr*., 98-256, p.6 (La.App. 3 Cir. 10/14/98), 722 So.2d 15, 19, *writ denied*, 99-385 (La. 5/28/99), 735 So.2d 622). In this case, we find no palpable error in the previous ruling of this court. The doctrine of law of the case is applicable; therefore, this assignment of error lacks merit.

### Reconciling the Verdicts

#### Standard of Review

The seminal issue that must be addressed in this appeal is the determination of the appropriate standard of review to be applied to the findings and apportionments of fault rendered as a result of this bifurcated trial. In *Thornton v. Moran*, 343 So.2d 1065 (La.1977), the supreme court stated that in such cases, the appellate court is to resolve the differences in the factual findings made by the jury with those made by the trial court and render a single opinion based upon the record.

_____

[3]Court of Appeal Docket No. CW-04-1273; La. Supreme Court Docket No. 04-CC-2354.

*Id.* The supreme court has since acknowledged that this pronouncement has resulted in multiple approaches being instituted by the appellate courts to reconcile such conflicting verdicts, but it has yet to finally resolve the issue. *See Davis v. Witt*, 02-3102, 02-3110 (La. 7/2/03), 851 So.2d 1119.

The first circuit advocates applying the manifest error standard of review initially to each of the fact finders' findings and apportionments of fault and, if both of the fact finders' results survive this review for error, then it undertakes a review of the record to determine the most reasonable of the findings in order to reconcile the verdicts. *Hussey v. Russell*, 04-2377, 04-2378 (La.App. 1 Cir. 3/29/06), ___ So.2d ___ (citing *Cornish v. State, Dep't of Transp. & Development*, 93-0194 (La.App. 1 Cir. 12/1/94), 647 So.2d 1170, *writs denied*, 95-0547, 95-0574 (La. 12/1/94), 654 So.2d 324); *see also*, *Thornton v. Moran*, 348 So.2d 79 (La.App. 1 Cir.), *writs denied*, 350 So.2d 897, 350 So.2d 898, 350 So.2d 899 (La.1977). The first circuit has explained its approach as follows:

> [W]e must . . . determine whether the findings of fault and apportionment of fault by the trial judge and the jury are reasonable and not manifestly erroneous. In the event that this court finds that the findings of both as to any particular determination are manifestly erroneous, this court is free to evaluate the facts de novo, and after a review of the complete record, make our own findings as to that particular determination. If in initially applying the manifest error test to the findings of the factfinders, this court concludes that a finding by one of the factfinders was manifestly erroneous, but the finding of the other is not, then we are free to disregard the finding of the factfinder that was manifestly erroneous. In other words, we would eliminate the clearly wrong finding and be left with only one reasonable finding.

*Hussey*, 04-2377, 04-2378 at p. 8 (quoting *Cornish*, 647 So.2d at 1178-79). As explained in *Thornton*, when both verdicts survive this review for error the "review-functional rule," also referred to as the "reasonable conclusion of fact" rule, is used

6

to reconcile any differences in factual findings. This is done by determining which witnesses were more credible in order to decide which fact finder gave the more reasonable measurement to the evidence in reaching its verdict and in order to determine which fact finder gave a more reasonable evaluation to the facts and drew a more reasonable inference from those facts. *Thornton*, 348 So.2d 79.

The second circuit currently employs this methodology as well. *See Hays v. State*, 37,229 (La.App. 2 Cir. 9/24/03), 856 So.2d 64, *writs denied*, 03-3187 (La. 2/6/04), 865 So.2d 726, 03-3218 (La. 2/6/04), 865 So.2d 729; *Eppinette v. City of Monroe*, 29,366 (La.App. 2 Cir. 6/20/97), 698 So.2d 658. However, in an earlier decision, *Mayo v. Audubon Indemnity Insurance Co.*, 26,767, 27,862 (La.App. 2 Cir. 1/24/96), 666 So.2d 1290, *writ denied*, 96-457 (La. 4/1/96), 671 So.2d 325, the second circuit held that de novo review was the appropriate standard of appellate review in a bifurcated case in which the judge and jury render inconsistent verdicts. The court relied on, then, Chief Judge Pike Hall's concurring opinion in *Smiley v. Sikes*, 543 So.2d 1084 (La.App. 2 Cir. 1989), which surveyed the current state of the courts on this issue, as well as a line of fourth circuit cases that have long advocated the application of the de novo standard of review in such situations. *Mayo*, 666 So.2d 1290. This decision was expressly abrogated by the second circuit, however, in *Eppinette*, 698 So.2d 658. The court returned to the conclusion that the appellate court should give some deference to the factual findings of the judge and jury and, if possible, should attempt to harmonize their inconsistent verdicts. *Id.*

The fourth circuit, as mentioned earlier herein, has held that no deference is to be given to the judge or jury's inconsistent determinations regarding liability or damages in bifurcated cases, and that the appellate courts should undertake a de novo review of the record to make its own independent findings based on the record. *See*

7

*Madison v. Ernest N. Morial Convention Ctr.-New Orleans*, 00-1929, 01-1127 (La.App. 4 Cir. 12/4/02), 834 So.2d 578, *writs denied*, 03-28, 03-30 (La. 6/20/03), 847 So.2d 1241; *McCullough v. Reg'l Transit Auth.*, 593 So.2d 731 (La.App. 4 Cir.), *writ denied*, 595 So.2d 655 (La.1992).

The fifth circuit has reconciled conflicting verdicts by examining the record and deciding which decision, the judge or the jury's, is the more reasonable. *American Cas. Co. v. Ill. Cent. Gulf R.R. Co.*, 601 So.2d 712 (La.App. 5 Cir.), *writ denied*, 604 So.2d 1005 (La.1992)(stating a reliance on this court's methodology set forth in *Succession of Theriot v. S. Pac. Transp. Co.*, 560 So.2d 861 (La.App. 3 Cir.), *writs denied*, 565 So.2d 451, 565 So.2d 453, 565 So.2d 454 (La.1990); *Felice v. Valleylab, Inc.*, 520 So.2d 920 (La.App. 3 Cir. 1987), *writ denied*, 522 So.2d 562 (La.1988)). It has expressly rejected the application of the manifest error rule in these cases. *Id*.

This court has not been uniform in its application of standards of review in these cases. We have stated an acceptance of the first circuit's approach set forth in *Thornton*, 348 So.2d 79, which states that where inconsistent findings are reached, an appellate court should resolve those differences and reach a single harmonized decision based on the record as a whole and then adopt the more reasonable decision. *See Hatcher v. State, Dep't of Transp. & Dev.*, 478 So.2d 774 (La.App. 3 Cir.), *writ denied*, 479 So.2d 923 (La.1985). More recently, in *Hasha v. Calcasieu Parish Police Jury*, 94-705 (La.App. 3 Cir. 2/15/95), 651 So.2d 865, *writs denied*, 95-667 (La. 4/28/95), 653 So.2d 592, 95-676 (La. 4/28/95), 653 So.2d 593 (Thibodeaux, J., concurring); however, we rejected this approach and relied on certain earlier decisions by our court which found that there is no conflict to be reconciled in a bifurcated trial in which the jury has apportioned fault to a governmental entity, when

8

the determination of that fault has been granted to the judge only. *Id.* (citing *Bishop v. Shelter Ins. Co.*, 461 So.2d 1170 (La.App. 3 Cir. 1984), *writ denied*, 465 So.2d 737 (La.1985); *Deville v. Town of Bunkie*, 364 So.2d 1378 (La.App. 3 Cir. 1978), *writ denied*, 366 So.2d 564 (La.1979)). It was reasoned that because the governmental entity's fault was to be tried by judge only, no deference need be given to the jury's findings or fault apportionment regarding the governmental entity. *Hasha*, 651 So.2d 865. In such cases, we did not attempt to reconcile the separate liability determinations made by the jury and judge as to the governmental entity but, rather, applied the manifest error standard of review to those adjudications on appeal. *Id.* However, we found that to the extent the assessment of damages by the separate fact finders is inconsistent, a conflict is created and those conflicting damage awards must be harmonized. *Id*. As to that determination, we stated that the appellate court is to examine the record to find which damage award is the more reasonable. *Id*.

Other than the fourth circuit, the standards of review employed by the remaining circuits, including this circuit, are too cumbersome and unwieldy to survive objective application. In fact, in some instances the standard used eschews the fact finder's role in that an appellate court is sometimes compelled to choose between two views which are both considered reasonable. We find that the most practical and legally sound procedure susceptible of *uniform* application is the de novo standard of review. As was observed in *Mayo*, 666 So.2d 1290, and as argued in the concurring opinion to this circuit's decision in *Hasha*, 651 So.2d 865, the appellate courts' prior holdings on the proper analytical tool to employ in reconciling these verdicts are, otherwise, inconsistent and confusing.

Further, we find that a reversible error of law is committed when judgments are rendered that do not fully determine the rights of the parties involved,

9

which is the case in bifurcated trials that restrict the separate fact finders' determinations of liability to certain parties. When appellate courts find that a reversible error of law was committed in the trial court, we are required to redetermine the facts de novo from the entire record and render a judgment on the merits. *Rosell v. ESCO*, 549 So.2d 840, fn. 2 (La.1989).

Accordingly, for this reason, and those set forth above, we will apply the de novo standard of review in this case. The remaining assignments of error of the DOTD and the Heberts' are rendered moot by this determination.

### *Liability and Apportionment of Fault*

The DOTD and the RPPJ are both public entities whose liability for the condition of the Haines Creek Bridge must be determined by establishing the following elements:

> In order to prove liability of a public entity based on a defective condition of a bridge or roadway the plaintiff must prove custody or ownership of the defective thing by the public entity; the defect created an unreasonable risk of harm; actual or constructive knowledge of the defect or risk of harm and failure by the public entity to take corrective action within a reasonable time; and causation.

*Aetna Cas. & Surety Co. v. State, through Dep't of Transp. & Dev.*, 97-0716, 97-0717, p. 5 (La.App. 1 Cir. 4/8/98), 712 So.2d 216, 219, *writ denied*, 98-1241 (La. 7/8/98), 724 So.2d 209. Regarding "off-system" roadways, we have recognized the following:

> The state has a duty to maintain a road or bridge or make a road or bridge safe where that road or bridge is included in the state highway system. La.R.S. 48:21; La.R.S. 48:191; and La.R.S. 48:193. Where the road or bridge is not on the state highway system and falls within a parish but outside the corporate limits of any municipality, a duty to maintain the road or bridge falls on the parish.

10

*Sopcjak v. City-Parish Gov't of Lafayette*, 98-240, 98-241, p. 3 (La.App. 3 Cir. 10/28/98), 721 So.2d 537, 539.

In this case, the parties do not contest that the bridge was not a part of the state highway system. However, the Heberts argued that the DOTD assumed liability for the bridge when it commenced regular inspections of the bridge. It was further argued that under La.R.S. 48:35[4], the DOTD had a legal duty to withhold funds if improvements to public roads failed to conform with the minimum public road and highway safety standards that it was required to establish. Because the DOTD never withheld any funds from the RPPJ, although its inspection reports revealed its knowledge of the absence of guardrails, the Heberts argued that the

[4]When Haines Creek Bridge was built in 1980, La.R.S. 48:35, as amended by 1977 La. Acts No. 291, § 35, read as follows:

> The office of highways of the Department of Transportation and Development shall adopt minimum safety standards with respect to highway design, construction and maintenance. These standards shall correlate with and, so far as possible, conform to the system then current as approved by the American Association of State Highway and Transportation Officials. Hereafter, the state highway system and all public roads, highways and streets under the jurisdiction of any political subdivision of this state shall conform to such safety standards. The chief engineer of the office of highways may designate those highways as listed in R.S. 48:191 on the effective date of this Act for reconstruction or repair at standards which are less than those approved by the American Association of State Highway and Transportation Officials, provided however, that no reconstruction or repair shall be done on any highway under this Part which results in a pavement width of less than eighteen feet, and further provided that all reconstruction or repair done under this Part shall be accomplished within the existing right of way.

> If any such improvements constructed by a political subdivision of this State fail to conform to such standards, *payment of any funds allocated to said political subdivision for such construction purposes shall be withheld by the Department of Transportation and Development until such time as the standards established by the department are complied with*. These standards shall not apply to maintenance, improvement or blacktopping of existing dead-end alleys, local lanes and other local roads that do not connect traveled throughways.

(Emphasis added). In 1984, this statute was amended to state that "payment of any funds allocated to the political subdivision for the construction purposes shall be withheld . . . ." 1984 La. Acts No. 625, § 1. Despite subsequent amendments to this statute, this language remains unchanged.

11

DOTD breached its duty and was comparatively negligent in the resulting accident and injuries.

The DOTD argues, contrarily, that its only involvement with the bridge was via its bridge inspections, which were carried out solely to comply with 23 U.S.C. § 144, the federal highway bridge replacement and rehabilitation program that requires states to perform inventories of bridges for purposes related to that program. The DOTD additionally contends that the Heberts misapplied La.R.S. 48:35 to the facts of this case and also have misinterpreted La.R.S. 48:35. It argues that the mandate to withhold funds allocated for construction purposes does not apply here because, first, there is no proof that the DOTD participated in funding this project or possessed the funds that could be withheld under the statute. Secondly, it argues that even if the mandate were applicable, under the circumstances of this case, the language cannot be read as a legislative imposition of a legal duty on it to ensure that an "off-system" bridge, such as this, is built or repaired to comply with adopted standards. Aside from the Heberts' sole reliance on these bridge inspections, which the DOTD claims do not serve as a sufficient basis to find that it assumed or possessed a duty to maintain the bridge, the DOTD contends that any findings of liability against it should be reversed since there is no evidence to support a finding that it acted in any manner to assume a duty to maintain this off-system bridge.

Without addressing whether La.R.S. 48:35 imposes a legal duty on the DOTD in this case, we find that the DOTD assumed a duty to maintain this bridge because it carried out biennial inspections of this non-conforming bridge over a fifteen-year period, participated in the construction of the bridge in 1980, and had constructive and, eventually, actual knowledge that it was built in a non-conforming manner. *See Archon v. Union Pac. R.R., et al.*, 94-2728, 97-2743 (La. 7/2/96), 675

12

So.2d 1055 (finding that the DOTD assumed a duty of upgrading a railroad crossing with active signals when it ordered a site survey and breached that duty when it failed to upgrade the crossing after the survey).

We first note that a former, twenty-two year employee of the DOTD and certified bridge inspector, Jerry Burnamen, testified that if the parish bridge was constructed using either state funds *or* DOTD funds, a state inspector would have been present during the construction phase of the project. The purpose would be to insure that the bridge would be built under acceptable standards.

The record also contains testimony from Cecil Raggio, who was employed by the RPPJ as its Public Works Director and Parish Engineer from 1977 to 2002, indicating that state funds were used to build the bridge, although he was not certain whether the construction funds were paid directly through the DOTD. He, however, identified at trial a letter that he sent to the DOTD regarding the construction of the bridge. The letter, he averred, contained a DOTD project number that he was required to use when corresponding with the state for reimbursements in connection with the bridge construction project.

Rhett Deselle, the District Maintenance Engineer for the DOTD from 1984 to 2000, testified that state funds could have been used to construct the bridge and, if so, the project would have been assigned a project number. He testified that the project number identified by Mr. Raggio was similar to the older project numbers that were once used by the DOTD.

Having determined that the DOTD, as well as the RPPJ, were both legally responsible for the maintenance of the bridge, we now turn to the determination of whether the absence of guardrails created an unreasonably dangerous condition. Regarding the duty of a governmental entity such as a parish

13

police jury to maintain its highways, roads, and streets, the Louisiana Supreme Court

in *Pickens v. St. Tammany Parish Police Jury*, 323 So.2d 430, 432-33 (La.1975),

stated:

> A parish police jury, however, is not an insurer of travelers upon its highways, roads and streets. The duty owed is to exercise reasonable care to keep these public ways in such condition that travelers who are prudent and ordinarily careful will not be exposed to injury, day or night. Louisiana's jurisprudence on the subject is built upon the theory that fault is a prerequisite to responsibility in these cases[, e].g.[,] *Goodwyn v. City of Shreveport*, 134 La. 820, 64 So. 762 (1914) and *Suthon v. City of Houma*, 146 So. 515 (La.App.1933).
>
> Although a parish is not an insurer of the safety of travelers on its highways, roads and streets and it must keep these ways reasonably safe, they need not be maintained in perfect condition to render the parish free from liability in damages. Defects which are not in the nature of traps, or from which danger cannot reasonably be anticipated, provide no actionable negligence. Liability will only be imposed when the defect is dangerous or calculated to cause injury. *Arata v. Orleans Capitol Stores*, 219 La. 1045, 55 So.2d 239 (1951); *White v. City of Alexandria*, 216 La. 308, 43 So.2d 618 (1949).
>
> There is no fixed rule for determining what is a dangerous defect in a public way; the facts and surrounding circumstances of each particular case control. The test usually applied, however, requires an answer to the question: Was the public way maintained in a reasonably safe condition for persons exercising ordinary care and prudence? *Arata v. Orleans Capitol Stores*, supra; *cf. Nessen v. City of New Orleans*, 134 La. 455, 64 So. 286 (1914); *Allen v. Town of Minden*, 127 La. 403, 53 So. 666 (1910).

*Breshers v. State of La., Dep't of Transp. & Development*, 536 So.2d 733, 737

(La.App. 3 Cir. 1988), *writs denied*, 541 So.2d 854, 541 So.2d 856 (La.1989)

(quoting *Pickens*, 323 So.2d at 432-33).

The evidence and testimony presented at trial showed that the lack of

guardrails on the Haines Creek Bridge created a hazardous and dangerous condition.

14

Expert witnesses testified that guardrails should have been placed at the ends of the bridge railings, which consisted of heavy-duty, three-inch, drill-stem pipe with unprotected ends, and which are not approved by the highway industry because of the danger they pose. These witnesses also testified that the purpose of guardrails on bridges is to prevent the type of collision and injuries that resulted in this case; however, at the time of construction and over the fifteen years leading up to Katie Hebert's accident, guardrails were never put in place.

The DOTD's and the RPPJ's knowledge of the fact that the bridge did not have guardrails is undisputed. Nevertheless, they both argue that the evidence shows that the speed of Katie's vehicle and her failure to maintain control of the vehicle caused the accident and injuries. We however find, as did the supreme court in *Campbell v. La. Department of Transportation & Development*, 94-1052 (La. 1/17/95), 648 So.2d 898, that the failure of the accident victim to maintain control of his or her vehicle does not relieve the responsible party of its duty to keep the roadway safe. Moreover, in this case, although the testimony of Katie's father was that she was an inexperienced driver, the Heberts' accident reconstructionist and consulting traffic engineer, Duaine T. Evans, testified that the lack of guardrails and hazard markers at the ends of bridge, as well as the lack of a visible center line on the road, were the major factors that contributed to the accident. He stated that guardrails in advance of a bridge are designed to absorb the energy of a vehicle crash and often prevent the type of death that occurred in this case. He also opined that other deficiencies, such as lack of curve warning signs or speed limit advisory signs and the large drop-off between the shoulder and the road, all contributed to the accident. Regarding Katie's rate of speed, he stated that it was likely that she did not enter the curve exceeding fifty miles per hour, because she would have run off of the road entirely before reaching the bridge.

15

The DOTD's expert, Dr. Joseph Blaschke, testified in the fields of traffic engineering, highway design, and accident reconstruction. He testified that Katie did not apparently lose control of the vehicle until her tires left the roadway, but felt that she was likely traveling faster than fifty miles per hour upon entering the curve. He also testified that the large drop-off to the shoulder of the road, the absence of guardrails, and the condition of the road all contributed to the accident.

Considering all of the evidence, we find that the negligence of Katie in driving the vehicle, and the RPPJ and DOTD's negligence in failing to reasonably maintain the bridge, particularly the failure to place guardrails on the bridge, combined to cause the accident and resulting death of Katie. In allocating the percentages of fault, we have considered "both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed." *Id*. at 902 (quoting *Watson v. State Farm Fire & Cas. Ins. Co.*, 469 So.2d 967, 974 (La.1985)). Based on the facts presented, we find that Katie's negligence likely set the course for the accident to happen, but the extent of the resulting *harm* to her was a direct result of her vehicle's impact with the exposed and unguarded pipes of the bridge railing. Accordingly, we find that the RPPJ's and DOTD's fault was more substantial than Katie's and, therefore, allocate 10 percent of the fault to Katie Hebert, 50 percent to the DOTD, and 40 percent to the RPPJ.

General damages are fashioned to compensate for the mental or physical pain or suffering, inconvenience, loss of intellectual gratification, physical enjoyment, or other losses of life which cannot be definitively measured in monetary terms. *Cox v. Moore*, 01-878 (La.App. 3 Cir. 12/12/01), 805 So.2d 277, *writ denied*, 02-724 (La. 5/31/02), 817 So.2d 94. Katie Hebert was the second oldest of six children. At the time of her death, she was the oldest child living at home. Katie helped significantly with household chores and was a close companion to her siblings. John and Klea

16

Hebert testified that their family was close-knit; the family ate dinner together every night, attended church together as a family at least three times per week, and visited with the children's grandparents, aunts, uncles, and cousins, as a family, generally, each Sunday. Holidays and birthdays were family affairs that were celebrated together. They both testified that the sudden loss of Katie left a "hole" in the family such that their usual activities were difficult for them all because her absence was so strongly felt.

Mr. and Mrs. Hebert both suffered from depression that was treated for years with anti-depressant and anti-anxiety medications after Katie's death. Mrs. Hebert developed physical ailments that were non-existent prior to Katie's death and for which she was continuing to receive treatment as of the trial of this matter. Mr. and Mrs. Hebert's marriage suffered after Katie's death as well, causing them to separate for awhile, although they sought extensive counseling for their problems. They both testified that the grief and stress associated with the loss of Katie, along with the concern for the welfare of their other children, caused them to withdraw from each other. They suffered a loss of intimacy, suffered a lack of communication, and developed anger issues. All of these were issues that were not present before their daughter's death. They both suffered difficulties on their jobs after the loss of Katie. Mrs. Hebert testified that she ultimately sought a new teaching position at a different school because of the tensions that developed with the administration over her excessive absences caused by her illnesses, depression and stress problems.

There is no question that the loss suffered by the Heberts as a result of their daughter's death is immeasurable, and we recognize the significance of their loss. We award Mr. and Mrs. Hebert general damages in the amount of $750,000.00 each, for the wrongful death of Katie.

Survival damages may be awarded for the pre-death mental and physical pain and suffering of the deceased. *Temple v. Liberty Mut. Ins. Co.*, 330 So.2d 891 (La.1976). The determination of survival damages includes consideration of the severity and duration of any pain or any pre-impact fear experienced by the deceased, and other damages sustained by the deceased up to the moment of death. *See Mathieu v. State, Dep't of Transp. & Dev.*, 598 So.2d 676 (La.App. 3 Cir.), *writ denied*, 600 So.2d 665 (La.1992); *Guillot v. Valley Forge Ins. Co.*, 99-1044 (La.App. 3 Cir. 12/8/99), 753 So.2d 891. Survival damages are properly awarded if a scintilla of evidence of any pre-death pain or suffering by the victim can be shown. *Mathieu*, 598 So.2d 676; *see also, Sims v. Liberty Mut. Ins. Co.*, 04-584 (La.App. 3 Cir. 3/2/05), 897 So.2d 834, *writ denied*, 05-863 (La. 5/13/05), 902 So.2d 1030.

In this case, the record reflects that Katie was pinned in her vehicle after the impact, suffered significant injuries, including a broken neck and head injuries. She did not expire, however, until some hours later at the hospital to which she had been air-lifted. We accordingly, award survival damages in the amount of $100,000.00, jointly, to John Hebert and Klea Hebert for the pre-death pain and suffering of Katie.

Finally, we award the following special damages to Mr. and Mrs. Hebert, jointly: past medical and hospital expenses for the treatment of Katie, $13,448.50; funeral and burial expenses, $5,077.00; past and future medical expenses of Mr. and Mrs. Hebert, $25,000.00; total loss of the Heberts' automobile, $9,850.00; and cost of a rental vehicle, $216.00.

IV.

**CONCLUSION**

For the foregoing reasons, we reverse and set aside the judgment of the trial court and render judgment, assessing 10 percent fault to Katie Hebert, 40 percent

fault to the Rapides Parish Police Jury, and 50 percent fault to the Louisiana Department of Transportation and Development. John Hebert is awarded $750,000.00, in general damages; Klea Hebert is awarded $750,000.00, in general damages; special damages are awarded jointly to John and Klea Hebert in the amount of $53,591.50. John and Klea Hebert are awarded survival damages in the amount of $100,000.00. Costs of this appeal are assessed to the Department of Transportation and Development in the amount of $741.50.

**AMENDED AND, AS AMENDED, AFFIRMED.**

STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

NO. 05-471

JOHN AND KLEA HEBERT

VERSUS

RAPIDES PARISH POLICE JURY, ET AL.

GREMILLION, J., concurs.

I write to concur with this opinion. I agree with the results in their entirety; however, I do not agree that when there are conflicting opinions between the judge and jury's finding in a bifurcated trial that we should conduct a de novo review because it disregards the great deference an appellate court should give to the trier of fact's finding.

In my opinion, we should use the procedure set forth in *McDaniel v. Carencro Lions Club, et al.,* #05-1013, (La.App. 3 Cir. __/__/__), __So.2d__.

JOHN AND KLEA HEBERT

VERSUS

RAPIDES PARISH POLICE JURY

PAINTER, J., dissenting.

This case on appeal was heard by a five judge panel after two members of the original three judge panel voted to reverse the trial jury and relieve the DOTD of responsibility for the Haines Creek Bridge. I respectfully disagree with the five judge panel majority's determination that the DOTD was legally responsible for the maintenance of the Haines Creek Bridge. My review of the testimony convinces me that the Plaintiffs failed to carry their burden of proving that the DOTD assumed a duty with regard to the bridge and breached that duty. Further, to impose liability on the DOTD under the circumstances of this case, based only federally mandated inspection, creates a precedent which would potentially make the DOTD liable for the maintenance of every off-system bridge and highway in the state and impose a crushing financial burden on the State.

The majority attempts to show that the DOTD provided funding for the bridge. However, a close review of the testimony of the witnesses shows that it does not support such a conclusion. While Jerry Bernamen did testify that if an off-system bridge was built using State funds, a DOTD inspector would be present, he further testified that he did not know if a DOTD inspector was present when the Haines Creek Bridge was built in 1980, explaining that "this was before we started our bridge program." Cecil Raggio testified that the DOTD did not participate in building the

1

bridge. Further, while Raggio did testify that the bridge was built with State funds, he further stated that he did not mean that the money came from the DOTD, but rather that he believed that the bridge was built with special funding from the Governor's Office and acknowledged that the Governor's Office has funds for special projects which are not under the control of the DOTD. While the majority's citation of Raggio as testifying that the money may not have come *directly* from the Governor's Office, suggests that the DOTD somehow indirectly controlled that funding, I find nothing in the record which supports this. Additionally, Raggio stated that the project number was a state project number but admitted that he did not know if it was a DOTD project number and that it could have been from the Governor's Office.

While Rhett Deselle did testify that State funds could have been used to construct the bridge, he also stated he could find nothing in the records of the DOTD which to show that it had funded the bridge. He testified that if the project had been a DOTD project it would have been given a DOTD project number but that the number found on the Police Jury's correspondence concerning this bridge was not a DOTD number. With regard to its resemblance to older DOTD numbers he stated only that its configuration–three digits separated by a dash from two digits separated by a dash from three final digits–was the same configuration previously used by the DOTD. He affirmed that the project number of the bridge did not exist in DOTD records. He explained that the Parishes inform the DOTD of changes to bridges to allow the DOTD to maintain an inventory of State bridges. He further explained that the funds could have come from a special fund of the Governor's Office which is used to replace and repair off-system bridges and that the DOTD has no control of those funds.

The only activity of the DOTD with regard to the Haines Creek Bridge which is confirmed by the record is its bi-yearly federally mandated inspection and report. This alone is insufficient to allow this court to impose a duty on the DOTD to maintain the bridge.

Additionally, the Plaintiff's assertion that the DOTD violated its duty, under La.R.S. 48:35, to withhold funds for improvements to public roads which do not conform to minimum safety standards adopted by the DOTD, is without merit. I can find no jurisprudence which imposes liability for personal injury on the DOTD for failure to withhold funds under this statute. Additionally, the language of La.R.S. 48:35 provides for withholding funds allocated for construction purposes during the particular non-conforming construction project.

Accordingly, the record does not support the imposition of liability on the DOTD for the accident made the basis of this suit. Therefore, I respectfully dissent from the majority opinion herein.